**HILLSIDE ENTERPRISES, a Missouri general business corporation, doing business as Hillside Vineyards, Inc., Appellant/Cross–Appellee,**

v.

**CARLISLE CORPORATION, doing business as Delaware Carlisle Corporation, Defendant,**

**Continental Carlisle, Inc., Appellee/Cross–Appellant.**

Nos. 94–2420, 94–2636.

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 13, 1995.

Decided Nov. 16, 1995.

Rehearing Denied Dec. 20, 1995.

---

John A. Walsh, Jr. (argued), St. Louis, Missouri, for appellant.

Mark Stephen Sableman (argued), St. Louis, Missouri (John J. Carey, David Wells and Jeffrey R. Fink, on the brief), for appellee.

Before McMILLIAN, HEANEY, and MURPHY, Circuit Judges.

DIANA E. MURPHY, Circuit Judge.

Hillside Vineyards, Inc. (Hillside) entered into a contract with Continental Carlisle, Inc. (Continental) to manufacture disposable plastic wine glasses for a new product Hillside planned to put on the market. Hillside was disappointed in the way its new business venture developed and sued Continental for breach of contract and misrepresentation. Continental counterclaimed for payment for glasses accepted by Hillside and for interest.

The case was tried to a jury which returned verdicts for Hillside in the amount of $465,-000 on its claims and for Continental in the amount of $164,948.17 on its counterclaim. Both parties appeal from the judgment entered by the district court.[1] Hillside seeks a new trial on damages because of what it views as erroneous evidentiary rulings at trial, and Continental seeks entry of judgment in its favor on Hillside's claims, prejudgment and postjudgment interest, and costs on its counterclaim.

## I.

William Murray, president of Hillside, conceived of selling wine in disposable plastic wine glasses with fliptop lids. Murray wanted to market the wine in cardboard carriers containing four glasses. Apparently no one had ever packaged wine in this way, and Murray expected the product to fill a market niche. In order to get the product on the market it was necessary either to modify existing products or to design and manufacture the glass, the carrier, and the lid. Murray chose an existing cap and carrier and found a plastic glass made by Rubbermaid to serve as a model. He could not use that glass, however, because the plastic did not meet government regulations.

Murray approached several companies, including Continental, about manufacturing the glasses. The project presented several unique challenges. First, the glasses needed to be able to form a vacuum seal with the lid. Second, they needed to be made from one of two plastics approved by the Food and Drug Administration for the sale of wine. Murray eventually chose PET plastic, which is clearer than the alternative but is considered difficult to mold, especially using the injection process required by Hillside to provide the necessary thickness in the walls of the glasses. Throughout several months of discussion, Continental expressed some confidence that it would be able to overcome these technical obstacles and meet Hillside's ambitious production schedule.

On August 18, 1988, Continental and Hillside executed a purchase agreement in which Hillside agreed to purchase not fewer than 100 million glasses over a two-and-one-half year period. Continental was required to pay all development costs for the glasses and "to employ its expertise and best efforts to manufacture said product in such quantities as may be required by Hillside." On the same day, Hillside submitted its first purchase order for five million glasses. On August 22, 1988, a Continental vice president responded in writing:

> We also acknowledge receipt of your Purchase Order #34951 for five million (5,000,-000) PET wine glasses at seventeen cents (17¢) each to be shipped as follows:
>
> 1,000,000 units from October 15 to November 15
>
> 2,000,000 units from November 15 to December 15
>
> 2,000,000 units from December 15 to January 15, 1989
>
> If we can be of further assistance, please do not hesitate to call.

In fact, Continental shipped fewer than 250,000 glasses by January 1, 1989 and none until November 22. Hillside had a number of problems with its product. Some of the glasses leaked, either because there were holes in the base or because imperfections in the lip prevented a tight seal with the lid. Poor vacuum seals also caused the wine in the glasses to oxidize, ruining the taste. Small plastic ridges on the lips of some glasses made the tops difficult to remove. In addition, Continental changed the shape of the glasses somewhat during development so they did not fit tightly in the cardboard carriers Hillside had purchased.

Hillside therefore had problems filling its first large order. A Texas distribution group had placed an order for Hillside's first 30,000 cases of wine, intending to capitalize on the holiday season market. By the end of November, Hillside had shipped only 4,000 cases, and the leaking and spoiling prevented many of those cases from being sold. Cus-

---

1. The Honorable Stephen Nathaniel Limbaugh, United States District Judge for the Eastern District of Missouri.

tomer dissatisfaction caused the product to fail within several months, and Hillside ceased operations.

Hillside filed suit against Continental (and its parent corporation) in November 1989, alleging that it had breached the purchase agreement and had misrepresented its ability to make the glasses without first producing a prototype.[2] Continental counterclaimed to recover the amount due for glasses accepted by Hillside before the product failed.

## II.

Hillside claims the district court erred in several respects in its evidentiary rulings on damage evidence: by excluding much of its evidence on lost profits and its evidence on the cost to resume business and by striking certain testimony of an expert it had retained. The district court allowed Hillside to present lost profits evidence relating to its inability to fill the Texas order and to amounts it owed distributors who received substandard wine and other creditors, but it excluded as too speculative evidence of lost profits on wine that had not yet been ordered.

Hillside argues that it should have been permitted to present evidence projecting future sales of its wine-in-a-glass. Oklahoma law applies to this claim by the terms of the contract. Especially where a new product and business are involved, however, lost profits are highly speculative and are generally not allowed as damages. *Carpenters' Local 1686 v. Wallis*, 205 Okla. 285, 237 P.2d 905, 908 (1951). Hillside argues that the general rule does not apply in this case. Because it had a firm order in Texas for 30,000 cases, it argues that it should be able to offer evidence of any other lost profits. It claims that it would have made millions of

dollars in profits but for Continental's failure to fulfill its obligations.

While the amount of lost profits need not be shown to a high degree of certainty under Oklahoma law, a party must demonstrate their existence. *Ferrell Construction Co. v. Russell Creek Coal Co.*, 645 P.2d 1005, 1009–10 (Okla.1982). In *Ferrell*, the owner of a coal mining lease entered into a contract permitting mining by another who sued for lost profits when the owner cancelled the contract. The miner's prospective profits were not too speculative because the amount of coal in question was known to the parties and was "reasonably accurate." *Id.* at 1010. Hillside's Texas order is analogous to the mining contract in *Ferrell* because the amount of wine to be sold can be fixed with some precision, just as the amount of coal to be mined. We do not read *Ferrell* or the cases cited by Hillside as mandating the introduction of all evidence regarding lost profits, no matter how speculative.[3]

To assume that the Texas order would have led to others in Texas and around the country is only speculative. Hillside's product could have failed for reasons independent of the problems with the glasses. It planned to charge four dollars for four glasses of generic wine, about as much as was charged for a gallon of the same wine in a glass jug. There is no proof that consumers would have found the convenience of the packaging more important than price or quality. The district court properly excluded the other evidence of lost profits.[4]

Hillside also contends that the district court erred by excluding evidence of the costs of restarting the wine-in-a-glass business. Hillside wished to present testimony that it would have cost $3.7 million to resume the business because its reputation in the industry had been damaged. This was far

---

**2.** The complaint and subsequent amendments to it also included other counts, all of which were dismissed before trial. Because it was not a party to the purchase agreement and had had no dealings with Hillside, Continental's parent corporation was dismissed before the case was submitted to the jury.

**3.** The cases cited in *Ferrell* each contain some limiting factor to provide a reasonable degree of

certainty as to the extent of lost profits. *See id.* Hillside in contrast seeks to project almost limitless profits.

**4.** Continental argues on the other hand that the court erred in allowing any evidence of lost profits. Lost profits and expenses related to the Texas order were reasonably certain, however, and were properly admitted by the district court.

removed from the less than $200,000 it had spent to start in 1988. Hillside claimed that better equipment, better wine, a California location, and a $1.5 million marketing budget would be necessary. Hillside concedes that it could find no case law supporting this alternative theory of damages which is highly speculative and could have left it in a much stronger position than when it started in 1988. Because Hillside was a new business with a new product, its reputation was more susceptible of harm and its capital was insufficient to test the product before rushing to market. The district court did not abuse its considerable discretion in refusing to allow Hillside to present this theory to the jury.

■ Hillside also argues that the district court improperly excluded part of the deposition of one of its experts. During cross-examination of the expert, Continental had elicited testimony regarding lost profits beyond the Texas order, i.e., that Hillside likely would have made $21 million in its first seven years of operation. The district court excised that portion of the videotaped deposition at Continental's request. Hillside contends this was error because the excluded evidence was produced from questions asked by Continental. Continental responds that it did not adopt the expert's testimony merely by seeking out his views on lost profits and that his responses relating to future damages were irrelevant. As discussed above, lost profits beyond the Texas order were highly speculative. The district court properly exercised its discretion in excluding the testimony.

### III.

On its cross-appeal, Continental argues that the district court erred in denying its renewed motion for judgment as a matter of law because Hillside did not present sufficient evidence of either a breach of the purchase agreement or of an actionable misrepresentation.

■ Hillside did present evidence that could have led the jury reasonably to conclude that Continental breached the agreement by failing to use its expertise and best efforts. For example, Continental had planned on packing the glasses upright and separated by layers of cardboard, but decided at the last minute to pack the glasses loose in boxes. An industry witness testified that packing the still-warm glasses in this manner made a tight vacuum seal with the cap less likely, leading to oxidation. Furthermore the jury may have concluded that Continental's promise to use its best efforts should be viewed together with its response to Hillside's August 1988 purchase order. Although the purchase agreement itself required only Continental's best efforts and expertise, its written response expressed no reservation about its ability to deliver five million glasses within five months. The jury could have reasonably concluded that Continental failed to perform as required under the purchase agreement and purchase order.[5]

■ Because the judgment in Hillside's favor on its contract claim is supported by substantial evidence, denial of Continental's renewed motion for judgment as a matter of law was proper. *Hastings v. Boston Mutual Life Insurance Co.,* 975 F.2d 506, 509 (8th Cir.1992). Since the judgment is supported on this claim, it is not necessary to reach the arguments about the misrepresentation claim. Even if the special verdict on misrepresentation were against the weight of the evidence or contrary to law as Continental claims, the verdict on the contract claim can be sufficient to support the award. *See Stoetzel v. Continental Textile Corp.,* 768 F.2d 217, 223 n. 4 (8th Cir.1985); *cf. Arkla Exploration Co. v. Boren,* 411 F.2d 879, 881 (8th Cir.1969). Careful review of the record shows no prejudice to Continental by submission of both theories. *See Kehm v. Procter & Gamble Manufacturing Co.,* 724 F.2d 613, 627 (8th Cir.1983) (affirming denial of renewed motion for judgment as matter of law

---

**5.** The purchase agreement contains an express integration clause, but the purchase order is a subsequent signed agreement by the parties and therefore can inform the interpretation of the original agreement under the terms of that agreement. *See Strickland v. American Bakery and Confectionery Workers Union & Industry National Welfare Fund,* 527 P.2d 10, 13 (Okla.1974); *cf.* Okla.Stat.Ann. tit. 12A, § 2–209(2); Okla.Stat. Ann.tit. 15, §§ 158, 237.

**1416**

where attorney misconduct did not prejudice moving party).

■ Continental also claims that it should have received pre- and postjudgment interest on its award of $164,948.17 and its costs. The district court's denial of its motion to amend or clarify the judgment regarding prejudgment interest and costs is reviewed for abuse of discretion. *E.E.O.C. v. Rath Packing Co.*, 787 F.2d 318, 333–34 (8th Cir.) (prejudgment interest), *cert. denied,* 479 U.S. 910, 107 S.Ct. 307, 93 L.Ed.2d 282 (1986); *J.E.K. Industries, Inc. v. Shoemaker,* 763 F.2d 348, 353 (8th Cir.1985) (costs). Postjudgment interest is mandatory under 28 U.S.C. § 1961, *Dunn v. HOVIC,* 13 F.3d 58, 60 (3d Cir.), *cert. denied, Owens–Corning Fiberglas Corp. v. Dunn,* — U.S. —, 114 S.Ct. 650, 126 L.Ed.2d 608 (1993), and should therefore be awarded.

In its reply brief, Hillside did not respond to Continental's argument that it is entitled to interest and costs but later moved to file a substituted reply brief addressing those issues.[6] Continental argues that it is entitled to prejudgment interest at one-and-a-half percent per month based on the contract or alternatively at the interest rate established by statute. 12 Okla.Stat.Ann. tit. 12, § 727 (West 1987). Hillside responds that Continental waived any right to prejudgment interest by not raising the issue until its motion to alter or amend the judgment. If prejudgment interest is applicable, Hillside claims that the contractual provision refers to a "service charge," not interest, and that the lower statutory rate should apply.

■ Continental is entitled to interest at the contractual rate. In its prayer for relief on its counterclaim, Continental asserted its right to "prejudgment interest and applicable service charges or late charges from the date of each Invoice, and postjudgment interest in the amount provided by law, and its costs and fees." In light of this request, we find no support in Hillside's pleadings or in Oklahoma law for the conclusion that Continental waived its claim for prejudgment interest. Although the contract uses the term "service charge," a sensible reading of the provision indicates it is an interest rate. The alternate construction proposed by Hillside would lead to a perverse result: Continental could seek both statutory prejudgment interest and the "service charge" in the contract, totalling over 26 percent per year. We reject that result. Where a contract specifies the rate of interest and where the amount of damages are ascertainable, interest should be awarded under Oklahoma law and at the contract rate, rather than the statutory rate. Okla.Stat. Ann. tit. 12, § 727.A.1. Continental was therefore entitled to an award of prejudgment interest at the contractual rate.

■ The district court properly exercised its broad discretion in awarding costs only to Hillside, however. Fed.R.Civ.P. 54(d); *Arthur Young & Co. v. Reves,* 937 F.2d 1310, 1339 (8th Cir.1991), *aff'd,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). Because Hillside won a larger judgment, it can logically be considered the prevailing party under the rule, and there was no abuse of discretion. *See Roberts v. Madigan,* 921 F.2d 1047, 1058 (10th Cir.1990), *cert. denied, Roberts v. Madigan,* 505 U.S. 1218, 112 S.Ct. 3025, 120 L.Ed.2d 896 (1992); 6 James W. Moore, Moore's Federal Practice ¶ 54.70[4].

Accordingly, Continental should receive prejudgment interest at the contractual rate of one-and-a-half percent per month and postjudgment interest at the statutory rate of 4.22 percent per year as mandated by 28 U.S.C. § 1961.

### IV.

For the reasons stated above, the judgments are affirmed, with the exception of the judgment in favor of Continental which is reversed only to the extent that interest was denied. We remand for further proceedings consistent with this opinion.

---

**6.** After considering the positions of the parties, the motion to file the substituted reply brief is granted.