# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 04-1039

_____

Wash Solutions, Inc., a Missouri     \*
Corporation,     \*
    \*
         Appellee,     \*
    \*     Appeal from the United States
        v.     \*     District Court for the Eastern
    \*     District of Missouri.
PDQ Manufacturing, Inc., a     \*
Delaware Corporation,     \*
    \*
         Appellant.     \*

_____

Submitted: November 15, 2004
Filed: January 24, 2005

_____

Before RILEY, JOHN R. GIBSON, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

PDQ Manufacturing, Inc. ("PDQ") appeals the district court's denial of its motion for judgment as a matter of law or, in the alternative, a new trial, and its entry of judgment on a jury verdict awarding $580,000 in compensatory damages and $125,000 in punitive damages to Wash Solutions, Inc. ("Wash") on Wash's claims of violation of the notice requirement under the Missouri Franchise Act ("the Act"), breach of contract, and tortious interference with a business expectancy. For the reasons discussed below, we affirm in part and reverse in part.

## I.    BACKGROUND

PDQ is a manufacturer of car washes. Wash was PDQ's exclusive distributor for the St. Louis, Missouri region until PDQ prematurely terminated the distributorship agreement in September 2001. Wash had been pursuing a new and potentially significant customer for PDQ products in Wallis Oil ("Wallis"), a Mobil fuel distributor in the region. At the time of the termination, Wash and Wallis were discussing a deal in which they would form a partnership to hold the exclusive distributorship. Before the deal could be completed, however, PDQ offered the exclusive distributorship directly to Wallis. Wallis accepted, and PDQ terminated Wash's agreement eight months before it was to expire. This lawsuit by Wash followed. The business history among PDQ, Wash and Wallis is explained more fully below.

During the late 1990s, PDQ's exclusive distributor in the St. Louis region was a company known as Nu-Look. In mid-1998, Nu-Look employee Scott Brooks began to cultivate Wallis as a potential customer for PDQ car washes. Wallis was considering the replacement of numerous car washes it had purchased from Ryko, a competitor of PDQ. Wallis' president, Mark Martinovich, testified that before Brooks' sales efforts, his opinion of PDQ had been "very low." As a result of Brooks' efforts, Wallis executives became convinced that PDQ's equipment and organization were far superior to Ryko.

In the spring of 2000, Brooks purchased Nu-Look and its exclusive PDQ distributorship for $233,000 and incorporated as Wash Solutions. On July 23, 2000, PDQ and Wash executed a new exclusive distributorship agreement for a term ending in June 2001. The agreement allowed PDQ to terminate the exclusive distributorship prematurely, but only for cause as listed in the agreement (e.g., failure to make sales quotas). The agreement also provided for automatic one-year renewals unless one party notified the other in writing of its intent not to renew at least 30 days prior to

the end of the term. No cause was required for a party to elect not to renew the agreement.

In June 2000, Martinovich presented Brooks with a schedule for the purchase of new car washes for 26 Wallis locations. Brooks informed PDQ via letter that Wallis was committed to buying PDQ equipment from Wash for those locations. Wallis soon purchased two newly-introduced model G-5 PDQ car washes from Wash. The two G-5s were plagued with the problems often associated with the roll-out of new products. Wash spent extensive time diagnosing and fixing problems with the car washes. While the G-5s were not functioning as promised, Wallis decided to purchase Ryko car washes for its next two locations. Nevertheless, Wallis continued to discuss with Wash the purchase of PDQ car washes for future locations on the Wallis schedule.

Sometime in early 2000, Brooks had first suggested to PDQ executives the idea of partnering with Wallis in a PDQ distributorship. Soon after Brooks incorporated Wash, Martinovich told PDQ's Director of Distributor Development, Richard Kochuyt, that Wallis was "excited" about the possibility of partnering with Wash in a PDQ distributorship. PDQ encouraged Wash's efforts to partner with Wallis. As of May 2001, neither PDQ nor Wallis questioned that Brooks and Wash would remain a part of the exclusive distributorship if Wallis decided to buy in.

In May 2001, PDQ requested Wash to renew the exclusive distributorship agreement by executing an addendum extending the term of the agreement to June 2002. Wash complied. By July 2001, however, PDQ was considering terminating Wash's exclusive agreement and offering the distributorship to Wallis directly. PDQ and Wallis met without Wash's knowledge to discuss a potential sale of the distributorship to Wallis. Wallis presented a business plan to PDQ that included a schedule for the purchase of car washes consistent with the schedule it had presented to Brooks a year earlier.

Meanwhile, Brooks and Martinovich continued to discuss a potential partnership between Wash and Wallis. No one informed Brooks of Wallis' separate negotiations to obtain the distributorship directly from PDQ. On August 28, 2001, PDQ offered the distributorship for the St. Louis region to Wallis. Unaware of PDQ's separate offer to Wallis, on September 20 Brooks provided Wallis with information about Wash's assets and lease agreements as a prelude to a possible partnership agreement. Brooks also surprised Wallis with the information that, as part of any possible partnership arrangement, he expected Wallis to pay $326,000 to cover his bank debt. As a result, Brooks' partnership offer to Wallis required Wallis to pay a total of $469,368. Wallis instead accepted PDQ's offer of the distributorship for $140,000 on September 25. PDQ sent Wash a notice of immediate termination three days later. After taking over the distributorship, Wallis continued to buy PDQ car washes in accord with the schedule it had given to Wash in June 2000.

Wash brought a diversity action against PDQ in federal district court claiming violation of the notice requirement under the Act,[1] breach of the exclusive distributorship agreement and tortious interference with a business expectancy. A jury found for Wash on all claims and awarded compensatory damages of $100,000 on the Act claim, $150,000 on the breach of contract claim, and $330,000 on the tortious interference claim. The jury also awarded punitive damages of $125,000 on the tortious interference claim. The district court entered judgment on the verdict, denying PDQ's post-verdict motion for judgment as a matter of law or alternatively for a new trial or remittitur. PDQ appeals.

---

[1]The Act provides that "[n]o person who has granted a franchise to another person shall cancel or otherwise terminate any such franchise agreement without notifying such person of the cancellation, termination or failure to renew in writing at least ninety days in advance of the cancellation, termination or failure to renew . . . ." Mo. Rev. Stat. § 407.405.

## II.     DISCUSSION

PDQ first contends that the evidence was insufficient to support the jury's award of damages for future lost profits.  As a corollary, PDQ contends that the district court erred in admitting the testimony of Wash's expert on damages.  PDQ next contends that there was insufficient evidence to support the jury's verdict for Wash on the tortious interference claim and that the district court erred by not clearly instructing the jury on the mutually exclusive nature of the two alternative business expectancies for that claim.  Finally, PDQ argues that the evidence was insufficient to support an award of punitive damages.

We review the district court's grant or denial of a motion for judgment as a matter of law de novo, using the same standard as the district court.  *Arabian Agric. Servs. v. Chief Indus.*, 309 F.3d 479, 482 (8th Cir. 2002).  Judgment as a matter of law is appropriate when "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party."  Fed. R. Civ. P. 50(a)(1); *Tipton v. Mill Creek Gravel, Inc.*, 373 F.3d 913, 917 (8th Cir. 2004). We view the record in the light most favorable to Wash and give it the benefit of all reasonable inferences.  *Tipton*, 373 F.3d at 917. Judgment as a matter of law is appropriate when the record contains no proof beyond speculation to support a verdict.  *Arabian Agric. Servs.*, 309 F.3d at 482.

We review the district court's denial of a motion for a new trial for abuse of discretion.  *Jones v. Swanson*, 341 F.3d 723, 732 (8th Cir. 2003).  "When 'the basis of the motion for a new trial is that the jury's verdict is against the weight of the evidence, the district court's denial of the motion is virtually unassailable on appeal.'" *Id.* (quoting *Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997)).

## A. Future Lost Profits

PDQ argues that Wash did not introduce sufficient evidence to support a claim for future lost profits because Wash had no history of profitable sales on which to base its future damages calculations. We disagree.

We apply Missouri law in this diversity action. *See Midwest Oilseeds, Inc. v. Limagrain Genetics Corp.*, 387 F.3d 705, 711 (8th Cir. 2004) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). "The general rule under Missouri law is that anticipated profits of a commercial business are too remote and speculative to warrant recovery." *Tipton*, 373 F.3d at 918 (citing *Coonis v. Rogers*, 429 S.W.2d 709, 714 (Mo. 1968)). However, anticipated profits can be recovered when they are "made reasonably certain by proof of actual facts, with present data for a rational estimate of their amount." *Coonis*, 429 S.W.2d at 714 (quotation omitted). "[S]peculation as to probable or expected lost business profits is spurned, and proof of lost profits must be substantial." *Tipton*, 373 F.3d at 919 n.6 (citing *Ozark Employment Specialists, Inc. v. Beeman*, 80 S.W.3d 882, 897 (Mo. Ct. App. 2002)).

For established businesses, expected future profits may be extrapolated with reasonable certainty from historical evidence of the income and expenses of the business prior to the damaging event. *Tipton*, 373 F.3d at 918. Of course, for a new business, such historical data is not available. However, "[w]hile the general rule requiring proof of expected profits with reasonable certainty places a greater burden upon a newly established business, it does not mean a new business can never recover lost profits." *Tipton*, 373 F.3d at 918 (quoting *Indep. Bus. Forms, Inc. v. A-M Graphics, Inc.*, 127 F.3d 698, 703 (8th Cir. 1997)).

We believe that Wash introduced evidence from which a jury could establish with reasonable certainty Wash's future lost profits resulting from the breach of the distributorship agreement. Wash's theory of recovery was that Wallis was committed

to obtaining PDQ car washes for at least 26 of its locations, as spelled out in the schedule first given to Wash in June 2000. Wallis did, in fact, continue to buy PDQ car washes as described by that schedule after Wash's exclusive dealership was terminated prematurely. Wash presented competent evidence as to what its net profit would have been from that series of sales had it been allowed to complete the term of the distributorship agreement. This was not speculation about future sales totals in the general car wash sales market, but "actual facts, with present data for a rational estimate of their amount." *Coonis*, 429 S.W.2d at 714 (quotation omitted).

PDQ correctly points out that under Missouri law, Wash is not permitted to simply adopt the sales record of its successor in the distributorship as its measure of future damages. PDQ compares this case to *Ozark Employment Specialists, Inc. v. Beeman*, 80 S.W.3d 882 (Mo. Ct. App. 2002). The plaintiff in *Ozark Employment Specialists*, a recruiter of computer programmers, lost its ability to recruit in the Philippines as a result of the defendant's breach. To prove the amount of its future lost profits, the plaintiff proffered evidence of the performance of a company hired to replace it in recruiting Filipino programmers. The court held that this evidence was insufficient to warrant the submission of the issue to the jury because it was not reasonably certain that the plaintiff would have recruited the same programmers and received the same fees as the replacement recruiter. *Id.* at 897.

PDQ argues that, similar to the plaintiff in *Ozark Employment Specialists*, Wash is relying on the car wash sales of the Wallis subsidiary that succeeded Wash as PDQ distributor to prove the amount of its future lost profits. However, this is a mischaracterization of Wash's theory of recovery. Wash did not claim that it would find the same new customers or make the same new sales as its successor. Rather, Wash claimed that Wallis was committed to buying PDQ car washes according to a specific schedule discussed with Wash before the termination. Wash's calculation of future lost profits was based solely on those previously scheduled sales. As a result, Wash was not "[p]rojecting . . . lost profits upon a future demand that [did] not

yet exist," which is "the kind of conjectural assumption that is disfavored by all Missouri courts that have addressed the issue of lost profits." *Tipton*, 373 F.3d at 919.

We believe this case is more analogous to *Hillside Enterprises v. Carlisle Corp.*, 69 F.3d 1410 (8th Cir. 1995) (applying Oklahoma law).[2] The plaintiff in *Hillside* contracted with a manufacturer to provide plastic wine glasses for its new business of selling prepackaged wine-by-the-glass. The plaintiff's business failed when the manufacturer was unable to produce wine glasses that met the contract specifications for leak-proof packaging. We held that evidence of projected future sales not based on any particular order was properly excluded as too speculative. *Id.* at 1414. However, we allowed the plaintiff to collect future lost profits based on an order already received for 30,000 cases because "the amount of wine to be sold can be fixed with some precision," *id.*, making lost profits and expenses related to the order "reasonably certain." *Id.* at 1414 n.4. As in *Hillside*, once the jury concluded that Wallis was committed to buying PDQ car washes according to the schedule discussed with Wash, the jury could fix with precision the number of car washes sold.

PDQ argues that the idea that Wallis would have continued to purchase PDQ car washes from Wash is unsupported speculation, contending that it ignores the added incentive for Wallis to buy PDQ equipment after it obtained the PDQ distributorship for itself. PDQ also relies on Martinovich's testimony that, had Wallis not obtained the distributorship, Wallis probably would have bought new Ryko, rather than PDQ, car washes for the scheduled locations. However, it was not mere speculation for the jury to find that Wallis would have bought PDQ car washes according to the June 2000 schedule even if Wallis had not obtained the distributorship. Wash introduced documentary evidence indicating that Wallis

---

[2]PDQ concedes that Oklahoma law is "similar, if not identical" to Missouri law on the issue of future lost profits.

executives felt Ryko car washes looked "terrible" in the eyes of Wallis' customers and that they felt PDQ was "light years" ahead of Ryko in terms of both equipment and organization. Wallis had informed Wash in June 2000 that Wallis was committed to buying PDQ car washes for the 26 locations. In light of this evidence, a reasonable jury could choose to disregard Martinovich's after-the-fact testimony and find that Wallis planned to buy PDQ car washes no matter who the distributor was.

PDQ next contends that the district court erred in admitting the testimony of Scott Stringer, Wash's expert on damages. "Decisions concerning the admission of expert testimony lie within the broad discretion of the trial court, and these decisions will not be disturbed on appeal absent an abuse of that discretion." *Anderson v. Raymond Corp.*, 340 F.3d 520, 523 (8th Cir. 2003).

PDQ's arguments center on Stringer's failure to address Wash's historical sales performance and his lack of knowledge of the car wash industry. However, given Wash's theory of recovery, it was unnecessary for Stringer to address those issues. As discussed above, Wash made no attempt to project future sales to unknown customers. Stringer was called upon only to calculate the net profit Wash would have made if it had received credit for the purchases Wallis made according to the June 2000 schedule. Stringer's damages analysis was broken down into three time periods to parallel Wash's claims against PDQ: (1) the 90-day period after the termination, representing damages for the violation of the notice requirement in the Act; (2) the period after the 90 days through June 2002, the natural expiration date of the distributorship agreement, representing additional damages for the breach of the distributorship agreement; and (3) the period after the June 2002 expiration date, representing damages for tortious interference with a business expectancy. The record contains ample evidence that Stringer was qualified to make these calculations as an expert in accounting and financial reporting. *See* Fed. R. Evid. 702.

PDQ also challenges Stringer's reliance on a document issued by PDQ to its distributors entitled "Value of a Nationa Account Sale" [sic]. The document sets forth the net profit a PDQ distributor could expect from the sale of a PDQ car wash. PDQ contends that Wash did not properly authenticate the document as an accurate representation of the profit Wash could have expected on each sale to Wallis.

"As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002) (quoting *Bonner v. ISP Tech., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001)). The expert's testimony must be excluded only if it is so fundamentally unsupported by the facts that it can offer no assistance to the jury. *Id.* Wash presented the deposition testimony of two other PDQ distributors who verified that the document was distributed by PDQ and that the information it contained was accurate. Therefore, the district court did not abuse its discretion in allowing Stringer to rely on the document in calculating Wash's future lost profits.

We hold that Wash's evidence was sufficient to support a claim for future lost profits. Therefore, we affirm the district court's denial of PDQ's motions for judgment as a matter of law or a new trial on that issue and affirm the jury award of $100,000 on the Act claim and $150,000 on the breach of contract claim. These amounts reflect lost profits from sales occurring between the date of the breach, September 2001, and the natural termination date of the agreement, June 2002.

### B.  Tortious Interference with a Business Expectancy

Wash also sought to recover damages for lost sales occurring after the natural termination date of the distributorship agreement, or alternatively for its expected profit from a partnership agreement with Wallis, on the theory that PDQ tortiously interfered with Wash's business expectancy. PDQ contends that the evidence was

insufficient to support a jury verdict and $330,000 award for Wash on the tortious interference claim because both of Wash's asserted business expectancies were based on mere speculation. We agree.

Under Missouri law, the elements of tortious interference with a contract or business expectancy are (1) a contract or valid business expectancy, (2) defendant's knowledge of the contract or relationship, (3) an intentional interference by the defendant inducing or causing a breach of the contract or relationship, (4) absence of justification and (5) damages. *Serv. Vending Co. v. Wal-Mart Stores*, 93 S.W.3d 764, 769 (Mo. Ct. App. 2002). With regard to the first element,

> The existence of a valid business expectancy will not be found where the facts showed a mere hope of establishing a business relationship which was tenuous. In order to have a claim for interference with a valid business expectancy, it is necessary to determine if the expectancy claimed was reasonable and valid under the circumstances alleged. If it is not, there was nothing for defendants to have interfered with.

*Id.* (citations omitted).

Wash advanced two alternative business expectancies. The first was that PDQ would have renewed its exclusive distributorship agreement with Wash in June 2002, when the prematurely terminated agreement was set to expire. In this case, Wash claimed future lost profits for the continued sales to Wallis after June 2002 in the amount of $355,000.

We can find no evidence in the record to suggest that PDQ would have renewed Wash's exclusive distributorship agreement after June 2002. To the contrary, the undisputed evidence shows that PDQ was actively seeking to replace Wash and had several potential candidates. In contrast to its duties under the agreement regarding premature termination, PDQ did not need any reason to refuse

to renew the agreement after its natural expiration. Therefore, it would have had no obligation whatsoever to retain Wash after the natural expiration of the agreement. Wash claims that had it been allowed to remain as exclusive distributor through June 2002 and receive credit for the sales to Wallis in that time period, PDQ gratefully would have renewed Wash in return for its sales performance. This is mere speculation. "Liability under a tortious interference theory cannot be predicated upon speculation, conjecture, or guesswork, and no fact essential to submissibility can be inferred absent a substantial evidentiary basis." *Mueller v. Abdnor*, 972 F.2d 931, 938 (8th Cir. 1992) (citing *A. L. Huber & Son, Inc. v. Jim Robertson Plumbing, Inc.*, 760 S.W.2d 496, 499 (Mo. Ct. App. 1988)).

The second, alternative business expectancy advanced by Wash was that Wallis would have accepted Wash's partnership proposal. Wash claimed damages of $469,368, its final asking price from Wallis, under this theory. Although the record contains plenty of evidence to suggest that Wallis was committed to buying PDQ car washes, we can find no evidence that Wallis was likely to accept Wash's partnership proposal, which included payment of Brooks' $326,000 bank debt. The undisputed evidence is that Wallis was flatly opposed to paying any significant amount toward Brooks' bank debt in order to create the partnership. With no prospect of receiving payment towards his bank debt, Brooks' own incentive to pursue the partnership on behalf of Wash became questionable as well. Again, it is mere speculation to assert that, had PDQ not offered the distributorship to Wallis directly, Wash and Wallis would have negotiated around this impasse.

Because there is no evidence in the record to show that Wash had a valid business expectancy with Wallis after its exclusive distributorship agreement with PDQ was set to expire, we reverse the district court's denial of PDQ's motion for judgment as a matter of law on Wash's claim of tortious interference with a business expectancy. We vacate the jury's verdict and award of $330,000 on that claim. Because of this result, we need not address PDQ's arguments regarding the jury

instructions on the claim of tortious interference with a business expectancy.

### C.   Punitive Damages

The jury's award of $125,000 in punitive damages to Wash was based solely on the tortious interference claim. Because we reverse on the tortious interference claim, we also vacate the $125,000 punitive damages award.[3]

## III.   CONCLUSION

We affirm the district court's denial of PDQ's motions for judgment as a matter of law or a new trial and affirm the jury verdict and award of $100,000 on the Act claim and $150,000 on the breach of contract claim. We reverse the district court's denial of PDQ's motion for judgment as a matter of law on Wash's claim of tortious interference with a business expectancy. We vacate the jury's verdict and award of $330,000 on that claim. Because we reverse on the tortious interference claim, we also vacate the $125,000 punitive damages award based on that claim. We remand the case to the district court for further proceedings consistent with this opinion.

_____

[3]Punitive damages are not available for a claim based solely on failure to provide notice of termination under the Act. *Ridings v. Thoele, Inc.*, 739 S.W.2d 547, 548 (Mo. banc 1987). Furthermore, under Missouri law, punitive damages are generally not available for a breach of contract claim unless "the breach amounts to an independent tort, separate from the contractual claim, accompanied by allegations of legal malice." *Kelly v. Golden*, 352 F.3d 344, 351 (8th Cir. 2003) (citing *Sands v. R. G. McKelvey Bldg. Co.*, 571 S.W.2d 726, 733 (Mo. Ct. App. 1978)). The jury instructions unambiguously stated that a verdict for Wash on the tortious interference claim was a necessary predicate for any award of punitive damages.