# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 04-2405/2464

_____

Jet Asphalt & Rock Co., Inc.,      *
     *
        Cross-Appellant/Appellee,      *
     *    Appeals from the United States
        v.      *    District Court for the
     *    Western District of Arkansas.
Angelo Iafrate Construction, LLC;      *
National Fire Insurance Company      *
of Hartford,      *
     *
        Appellants/Cross-Appellees.      *

_____

Submitted: April 11, 2005
Filed: December 9, 2005

_____

Before COLLOTON, McMILLIAN, and BENTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

A jury found Angelo Iafrate Construction, LLC, and National Fire Insurance Company of Hartford (together, "Angelo Iafrate") liable for breach of contract, awarding damages in the amount of $192,511.50 to Jet Asphalt & Rock Co., Inc. ("Jet Asphalt"). Angelo Iafrate appeals, contending that the district court[1] should have granted its motions for judgment as a matter of law on Jet Asphalt's breach of contract

_____

[1]The Honorable Harry F. Barnes, United States District Judge for the Western District of Arkansas.

claim and on Angelo Iafrate's counterclaim for breach of contract. Jet Asphalt defends the district court's judgment, but also cross-appeals, arguing in the alternative that if the jury's verdict is set aside, then the district court's judgment as a matter of law in favor of Angelo Iafrate on Jet Asphalt's claim of common law fraud also should be reversed. We conclude that the district court correctly determined that the resolution of this dispute turned on issues of fact that were properly submitted to a jury, and we therefore affirm the judgment.

I.

In 2000, Angelo Iafrate and Jet Asphalt were competing bidders for a contract with the State of Arkansas for work on a State Highway Commission ("Commission") project known as the Bearden Bypass. Angelo Iafrate won the contract with a bid of approximately $6.4 million. Because the project was funded partially by the federal government, Angelo Iafrate was required to subcontract 10% of the work to disadvantaged business enterprises ("DBEs"). DBEs are "for profit small business concern[s] . . . at least 51 percent owned by one or more individuals who are both socially and economically disadvantaged" and managed by "one or more of the socially and economically disadvantaged individuals who own it." (Appellant's App. at 127).

Along with its bid, Angelo Iafrate submitted forms proposing the type and amount of work that would go to DBEs ("DBE forms"). In its DBE forms, Angelo Iafrate proposed apportioning a total of $641,268.05 of work among several DBE businesses. One of the DBEs named in Angelo Iafrate's DBE forms was NKP Trucking ("NKP"), which was to perform hauling services valued at $361,727.00. According to the form, NKP was to haul construction materials, namely compacted embankment and mineral aggregate, at various stages of the project. The State approved Angelo Iafrate's DBE forms, and Angelo Iafrate commenced work on the project.

In April 2001, Angelo Iafrate subcontracted a substantial portion of the Bearden Bypass work – about $2.6 million – to Jet Asphalt. The subcontract between Jet Asphalt and Angelo Iafrate incorporated by reference "all documents of the Prime Contract (including, but not limited to General, Supplementary, and Other Conditions)." (*Id*. at 192). It also stipulated that Jet Asphalt "hereby affirms that [it] has examined all Contract Documents, and agrees that [it] will not plead unfamiliarity with any of said Documents in connection with any dispute which may arise hereunder or in connection with any claim for extra compensation." (*Id*.). The subcontract provided that Jet Asphalt "shall be bound to the same extent that [Angelo Iafrate] is bound by each and every covenant, obligation, and provision of the Prime Contract insofar as the same is applicable to the work" of Jet Asphalt. (*Id*.).

Two provisions of the subcontract addressed Jet Asphalt's use of DBEs. In the sixth of a series of "Special Provisions" attached to the subcontract ("special provision six"), Jet Asphalt promised to "provide a minimum of $300,00[0][2] dollars of minority business enterprise participation from certified companies." (*Id*. at 203). Additionally, section 103.08(b)(4) provided as follows:

> No work shall be performed by the Contractor or any subcontractor on items originally committed to or included in a subcontract (including purchase orders or other written agreements) with a DBE without prior written approval by the Department. Payments to the Contractor will be withheld or previous payments recovered by the Department in amounts equivalent to that portion of the subcontract with a DBE in which . . . [t]he Contractor or any subcontractor performs any portion of the work to be accomplished by a DBE without prior written approval by the Department.

(*Id*. at 126-27).

---

[2]The parties agree that the provision was intended to read "$300,000," not "$300,00," and that the discrepancy was due to a typographical error.

At the time that Angelo Iafrate subcontracted the remaining work on the Bearden Bypass to Jet Asphalt, NKP had performed only one of the hauling tasks that Angelo Iafrate's DBE form had assigned to it. NKP had hauled compacted embankment but had not hauled mineral aggregate. Jet Asphalt subcontracted with a different trucking company, Anders Trucking ("Anders"), to haul mineral aggregate for the project. Anders performed the hauling work, and the Bearden Bypass was successfully completed.

On July 30, 2002, the Highway Department issued a change order deducting $290,367.70 from Angelo Iafrate's compensation. The deduction was attributed to three causes. "Failure to use NKP Trucking" accounted for a deduction of $235,727.00; "[f]ailure to fully utilize W Trucking," another DBE contractor, accounted for a deduction of $50,683.19; and the lack of a purchase order agreement or subcontract with a third DBE contractor, Camden Concrete, accounted for the remaining $3,964.86 of the deduction. (*Id*. at 208). According to the change order, all of these deductions were due either to Angelo Iafrate's failure "to utilize DBE's on items originally committed to DBE's without prior written approval," or to its failure to provide adequate documentation for work to be performed by a DBE. (*Id*. at 207). Angelo Iafrate then withheld $295,375.04 in payment from Jet Asphalt.[3]

In November 2002, Jet Asphalt brought suit against Angelo Iafrate in the district court, alleging that the company had breached its contract with Jet Asphalt by withholding the $295,375.04. Jet Asphalt also alleged, in the amended version of its

---

[3]The $5,000 discrepancy between the amount withheld by the State in the change order ($290,367.70) and the amount withheld from Jet Asphalt by Angelo Iafrate ($295,375.04) was explained, at least initially, by a modification to the change order. An earlier version of the change order had withheld $55,683.19 due to Angelo Iafrate's failure to fully utilize W Trucking. After Angelo Iafrate subsequently paid W Trucking $5,007.35 for additional work, the withheld amount was reduced to $50,675.84. Angelo Iafrate, however, still withheld the amount of the original change order from Jet Asphalt.

complaint, that Angelo Iafrate committed the torts of deceit and fraudulent inducement. Angelo Iafrate answered and counterclaimed for breach of contract, alleging that Jet Asphalt had breached the subcontract by failing to use an approved DBE subcontractor, and that this breach had caused the State to withhold the $295,375.04. These claims were tried to a jury on May 3-4, 2004. At the end of Jet Asphalt's case, the district court granted Angelo Iafrate's motion for judgment as a matter of law as to the tort claims, but denied its motion as to the breach of contract claims. The district court similarly denied Angelo Iafrate's renewed motion for judgment as a matter of law. The jury returned a verdict in favor of Jet Asphalt on Jet Asphalt's breach of contract claim against Angelo Iafrate, and awarded damages of $192,511.50. The district court entered judgment for Jet Asphalt, and both parties appealed.

## II.

Angelo Iafrate contends that the district court erred by submitting the breach of contract claims to the jury. Angelo Iafrate maintains that the contract between it and Jet Asphalt was unambiguous, and that its interpretation was therefore a question of law to be decided by the district court. We review a district court's denial of a motion for judgment as a matter of law *de novo*, applying the same standard as the district court. *Wash Solutions, Inc. v. PDQ Mfg., Inc.*, 395 F.3d 888, 892 (8th Cir. 2005). Judgment as a matter of law is appropriate only when there is "no legally sufficient evidentiary basis" on which a reasonable jury could find for the non-moving party. Fed. R. Civ. P. 50(a)(1); *Wash Solutions*, 395 F.3d at 892. Under Arkansas law, the determination whether a contract is ambiguous is a question of law. *Pittman v. Pittman*, 139 S.W.3d 134, 136-37 (Ark. Ct. App. 2003). Unambiguous contracts are construed as a matter of law, while the meanings of ambiguous contracts are determined by the finder of fact. *Id.*

At trial, Angelo Iafrate argued that Jet Asphalt had failed to comply with two contract provisions. First, it urged that Jet Asphalt had breached special provision six, which specified that Jet Asphalt was to "provide a minimum of $300,00[0] dollars of minority business enterprise participation from certified companies." (Appellant's App. at 203). We agree with the district court that whether Jet Asphalt breached this provision was a question of fact properly submitted to the jury. To Angelo Iafrate, the term "certified companies" means minority or disadvantaged business enterprises approved by the Highway Department for work on the Bearden Bypass project. But the evidence revealed ambiguity. The Highway Department maintains a list of companies that are "certified" as minority business enterprises, independent of any particular project. (Tr. 58). Any of these companies then may be approved for work on a specific project, and the Department's witness even testified that, "I don't believe certified is a correct term" for this approval process. (Tr. 59). At best, therefore, it is unclear from the plain language of the contract whether Jet Asphalt was obliged to use companies certified from the State's master list (which included Anders, Tr. 58), or companies approved or "certified" specifically for the Bearden Bypass project (*i.e.*, NKP).

In addition, Jet Asphalt argued that even if "certified companies" in this prime contract meant only NKP Trucking, which had been approved by the State, then Jet Asphalt's obligation to use NKP had been excused by Angelo Iafrate's failure to obtain approval from the Department to substitute Anders for NKP. Special provision six did not expressly contemplate substitute DBEs, and the subcontract did not allocate to either party responsibility for obtaining approval of a substitute DBE. There was testimony at trial that the prime contractor is generally responsible for such tasks. There was also testimony that Jet Asphalt informed Angelo Iafrate of its intention to use Anders to satisfy its DBE requirement.

Noting the contract's silence on the subject of which party was responsible for obtaining approval for Anders, the district court concluded that "there is a fact

question based on . . . whose responsibility it was to get Anders approved by the state." (*Id.* at 287). The court characterized this question as a possible "latent ambiguity." (*Id.* at 284). A latent ambiguity "arises from undisclosed facts or uncertainties of the written instrument," *Coble v. Sexton*, 27 S.W.3d 759, 761 (Ark. Ct. App. 2000), and parol evidence is admissible under Arkansas law to "bring out [a] latent ambiguity" in a contract. *Countryside Cas. Co. v. Grant*, 601 S.W.2d 875, 877 (Ark. 1980). In light of the testimony at trial regarding industry practice and the circumstances surrounding the signing of the subcontract, we agree with the district court that the responsibility for obtaining this approval may have resided with Angelo Iafrate, and that Angelo Iafrate's failure to do so might have excused Jet Asphalt's performance under special provision six. Whether Jet Asphalt's alleged non-compliance with special provision six constituted a breach of contract, therefore, was a question for the jury.

Second, Angelo Iafrate argued that Jet Asphalt breached section 103.08(b)(4) of the prime contract, which instructs in relevant part that "[n]o work shall be performed by the Contractor or any subcontractor on items originally committed to or included in a subcontract (including purchase orders or other written agreements) with a DBE without prior written approval by the Department." (Appellant's App. at 126). Insofar as this provision applied to the work of Jet Asphalt under the subcontract, Jet Asphalt was bound by its requirements. Angelo Iafrate urges that by using Anders to haul mineral aggregate, Jet Asphalt performed work on an item "originally committed to . . . a DBE" (in this case NKP), without prior written approval by the Department, and thus breached the contract.

The district court concluded that although the literal terms of the contract were unambiguous, the agreement did not address issues surrounding the use of a DBE that was not approved in the prime contract. The court observed there was "no question" that "Angelo knew that Jet was going to use Anders," and that a jury should decide "who was responsible under the contract to begin the process to qualify Anders." (Tr.

283-84). We take this to be an invocation of the rule, long recognized in Arkansas, that a party may waive a breach of a condition set forth in a written contract by permitting the other party to proceed with performance of the contract after discovering the apparent breach. *Grayson-McLeod Lumber Co. v. Slack-Kress Tie & Stave Co.*, 143 S.W. 581, 583 (Ark. 1912). The rule, as stated by the Supreme Court of Arkansas, is that "one party to a contract who, with knowledge of a breach by the other party, continues to accept benefits under the contract, and suffers the other party to continue in performance thereof, waives the right to insist on the breach." *Southern Pipe Coating Inc. v. Spear & Wood Mfg. Co.*, 363 S.W.2d 912, 914 (Ark. 1963); *see also Stephens v. West Pontiac-GMC, Inc.*, 647 S.W.2d 492, 493 (Ark. Ct. App. 1983); *Fielding & Shepley, Inc. v. Dow*, 163 P.2d 908, 909 (Cal. Dist. Ct. App. 1945); E. Allan Farnsworth, *Farnsworth on Contracts* § 8.5 (2d ed. 1998).

There was testimony in this case from Jet Asphalt's president that when the subcontract was negotiated, he informed the president of Angelo Iafrate that Jet Asphalt intended to use Anders Trucking as a DBE contractor, and that Angelo Iafrate's president raised no objection. (Tr. 218-19). As the district court remarked, this evidence supported a finding that Angelo Iafrate knew throughout the project that Jet Asphalt was making use of Anders, rather than NKP, for the disputed hauling work. This evidence was received along with other testimony showing that the prime contractor, in this case Angelo Iafrate, typically bore responsibility for gaining approval of DBE contractors from the Highway Department. Under these circumstances, a jury reasonably could conclude not only that Jet Asphalt informed Angelo Iafrate about the use of Anders Trucking, but that Angelo Iafrate led Jet Asphalt to believe that use of Anders was agreeable, and that Angelo Iafrate was in the best position to resolve any approval requirements with the State. We thus find no error in the district court's decision to submit to the jury the question whether Jet Asphalt's compliance with section 103.08(b)(4) was excused by events subsequent to the formation of the contract.

For the foregoing reasons, the judgment of the district court is affirmed.

_____