# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 03-2821 and 03-2868

_____

| | | |
|---|---|---|
| Marvin Tipton, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Mill Creek Gravel, Inc.; | * | Appeals from the United States |
| | * | District Court for the |
| Defendant-Appellant, | * | Western District of Missouri. |
| | * | |
| Ed Kelley; Dixie Kelley, | * | |
| | * | |
| Defendants-Appellants. | * | |

_____

Submitted: January 12, 2004
Filed: June 28, 2004

_____

Before BYE, LAY, and SMITH, Circuit Judges.

_____

LAY, Circuit Judge.

Marvin Tipton brought this shareholder derivative action against Ed and Dixie Kelley ("the Kelleys") on behalf of Mill Creek Gravel, Inc. ("Mill Creek"), alleging breach of a pre-incorporation agreement. The case went to trial, whereupon the jury found a breach of the agreement and awarded Mill Creek $1.5 million in damages. The Kelleys now appeal on numerous grounds; we affirm in part and reverse in part.

# I. BACKGROUND

The Kelleys own a large tract of land near the Arkansas border in southwestern Missouri, which they refer to as "Lazy E Estates." In April of 1999, Ed Kelly was approached by businessmen Marvin Tipton and Lindy Barrett about the possibility of mining gravel on the Kelleys' property. Tipton and Barrett owned and operated 2-N-1, Inc. ("2-N-1"), which acted as a "go-between" service, arranging for businesses in need of gravel to enter private landowners' property to remove rock and soil. After 2-N-1 determined that Lazy E Estates contained gravel, it reached a verbal agreement with Ed Kelley to allow the mining of gravel from the property. In return, 2-N-1 agreed to make royalty payments to the Kelleys in the amount of fifty cents for each cubic yard of gravel or dirt removed. Tipton proceeded to file a mine plan with the Missouri Department of Natural Resources requesting permission to mine 135 acres on Lazy E Estates through the year 2019. The plan was approved. Later, in July of 1999, Ed Kelley memorialized his verbal agreement with Tipton in a written contract, which permitted either party to terminate the agreement upon thirty days written notice. The Kelleys received approximately $3,000 to $5,000 in royalty payments under the contract.

Although it is disputed who first introduced the idea, in the fall of 1999 Ed Kelley and Tipton talked about Kelley becoming a partner in 2-N-1. This never occurred, however, apparently because of Barrett's reluctance to the idea. At this point, without providing the thirty-day notice, Kelley terminated 2-N-1's access to his property.[1] A few months later, however, in December of 1999, Ed Kelley and Tipton entered into a pre-incorporation agreement (the "agreement" or "contract") for the creation of a gravel mining corporation. Again, it is disputed who initiated the idea

---

[1] The Kelleys maintain that Tipton requested that Kelley terminate access so that he and Kelley could obtain 2-N-1's mine permits and form a new business, Mill Creek. Tipton implies that Kelley did it because he was upset that he was not made a partner in 2-N-1.

or what the parties' motivations were for entering the agreement.[2] Tipton and Kelley were the only two shareholders of Mill Creek stock, with Ed Kelley owning fifty-one percent of the corporate stock, and Tipton owning forty-nine percent. The agreement contained no right of revocation, nor any provision setting a date by which the gravel plant was required to be in operation. The agreement did, however, provide that "Ed Kelley shall lease to the corporation adequate property in the valley of his property known as Lazy E Estates for a gravel and rock operation with royalties of $.50 per yard." Mill Creek was subsequently registered as a corporation with the Missouri Secretary of State.

In early 2000, a $500,000 loan was obtained for the equipment and other expenses necessary to set up the mine site. In February of 2000, Mill Creek filed a mine plan for twenty acres with the Missouri DNR, which was approved. Tipton testified at trial that the intent was to mine these twenty acres until Mill Creek could secure the 135 acre mine plan of 2-N-1 mentioned above, which would be revoked when 2-N-1 failed to file an annual renewal. Tipton appears to have been primarily in control of setting up the gravel plant during 2000. He oversaw the work required to put in new roadways, assemble new gravel plant equipment, and generally get the gravel plant up and running. He did not receive a salary for his work.

By the fall of 2000, the relationship between the parties began to sour. Ed Kelley became angered that the plant was still not operational, despite the fact that Tipton had spent all $500,000 loaned and an additional $200,000 of the Kelleys' personal funds. Consequently, just before Thanksgiving, Ed Kelley told Tipton that he had decided to take over the mining operations, and that Tipton should focus his

---

[2]Tipton argues that he was "forced" to agree to form a new corporation because he could not otherwise access the land to take advantage of his mine permit there. The Kelleys argue that Tipton lured them into forming Mill Creek with false representations that Tipton was experienced enough to set up and operate a profitable mining plant on their property.

efforts on obtaining contracts to sell gravel. Tipton, however, was not successful in selling any gravel. Ed Kelly, around this time, also asked Tipton to contribute money in order to keep Mill Creek operational. Tipton did not have any money, and was unable to borrow any money at that time because he had already signed a personal guaranty for the $500,000 Mill Creek note.

In January of 2001, Kelley told Tipton to get off the property and barred him from entering thereafter. At the time, Kelley allegedly told Tipton "You own 49 percent of nothing and nothing is nothing and if I have to, I'll bankrupt this corporation and start a new one tomorrow." Instead of dissolving the corporation properly, however, the evidence at trial showed that the Kelleys continued to perform some mining operations after Tipton's removal and sold some Mill Creek equipment, without remitting any sales to the Mill Creek treasury or following any corporate formalities.

On March 15, 2003, Tipton filed a shareholder derivative suit in federal district court for the Western District of Missouri on behalf of Mill Creek against the Kelleys alleging, *inter alia*,[3] that Ed Kelley breached the pre-incorporation agreement insofar as he prohibited Mill Creek from mining gravel on his land. Much of the trial consisted of testimony regarding Tipton's lost profits theory of damages. Numerous witnesses were called upon to testify regarding the amount of gravel available on Lazy E Estates, the purposes to which that gravel could be put, the prevailing value of such gravel, and the demand for such gravel at present and in the future. After a three-day trial, the jury found that Kelley breached the agreement and returned a verdict for Mill Creek in the amount of $1.5 million. Over the Kelleys' objections, the district court then assessed costs against the Kelleys in the amount of $13,689.11, and assessed Tipton's attorney fees against Mill Creek in the amount of $91,192.46.

---

[3]Tipton's Complaint also alleges breach of fiduciary duty, fraudulent misrepresentation, and quantum meruit.

The Kelleys filed motions for judgment as a matter of law and a new trial, which were denied. The Kelleys now appeal the denial of those motions and the district court's award of costs and attorney fees to Tipton.

## II. ANALYSIS

*Breach of Contract*

The Kelleys argue that the district court erred in denying their renewed motion for judgment as a matter of law, claiming that Tipton failed to present sufficient evidence for a reasonable jury to conclude that the Kelleys breached the pre-incorporation agreement.

We review a denial of a motion for judgment as a matter of law *de novo*, using the same standard as the district court. See Lawrence v. CNF Transp., Inc., 340 F.3d 486, 491 (8th Cir. 2003). Judgment as a matter of law is appropriate when "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party." Fed. R. Civ. P. 50. We view the record in the light most favorable to Tipton and give him the benefit of all reasonable inferences. Lawrence, 340 F.3d at 491.

The Kelleys argue that they had no duty under the terms of the pre-incorporation agreement to operate the business indefinitely, and therefore their decision to shut down the corporation was not a breach of the agreement. We conclude, however, that there was sufficient evidence for a reasonable jury to find a breach of the pre-incorporation agreement, which provides, in relevant part: "Ed Kelley shall lease to the corporation adequate property in the valley of his property known as 'Lazy E Estates' for a gravel and rock operation with royalties of $.50 per yard." Contrary to the Kelleys' arguments, the pre-incorporation agreement clearly creates a duty for Ed Kelley to lease his land to the corporation for a gravel and rock operation. The contract contains no right of revocation or requirement that the mine

be operational by a certain date. A mine plan subsequently filed by the corporation extends until 2019, making it possible for the jury to find that the parties intended the lease of the Kelleys' property to extend at least until that time.

The undisputed evidence in this case is that Ed Kelley ejected Tipton from the property, and would not allow him to return to operate the Mill Creek mining business. The evidence further reveals that the Kelleys thereafter attempted to continue mining operations for their own personal benefit and without respect for Mill Creek's rights under the contract or Tipton's rights as a shareholder. For instance, the Kelleys sold Mill Creek equipment for their own personal benefit without remitting the money from the sale to Mill Creek. Furthermore, the Kelleys sold property that Mill Creek intended to mine to a third party. Finally, Ed Kelley failed to conduct required Mill Creek shareholder meetings or to file 2000 or 2001 Mill Creek tax returns. In light of this evidence, we believe a reasonable jury could find that the Kelleys prevented Mill Creek Gravel from performing mining operations on their property, essentially ruining that enterprise and salvaging what was left for themselves personally. As this was clearly a breach of Kelley's duty under the pre-incorporation agreement, we hold that the district court's denial of the Kelleys' renewed motion for judgment as a matter of law on this issue was correct.

*Lost Profits*

Tipton argued at trial that, as a result of Ed Kelley's breach, Mill Creek was deprived of around $14 million in profits that the gravel corporation would have generated due to increased growth in the area. The jury agreed, at least in theory if not in amount, and awarded Mill Creek about ten percent of what Tipton asked for, or $1.5 million. On the Kelleys' renewed motion for judgment as a matter of law, the district court upheld the award, stating "it cannot be said that there was a complete absence of probative facts to support plaintiff's claim for lost profits, and that the jury

could conclude, as it apparently did, that Mill Creek could have achieved profits of approximately 10% of plaintiff's estimates."

The Kelleys argue that the district court erred in denying their renewed motion for judgment as a matter of law with regard to the issue of lost profits. The Kelleys claim that Tipton failed to present sufficient evidence for a reasonable jury to find lost profits and did not meet the exacting burden of proof for establishing lost profits under Missouri law.

The general rule under Missouri law is that anticipated profits of a commercial business are too remote and speculative to warrant recovery. Coonis v. Rogers, 429 S.W.2d 709, 714 (Mo. 1968). They can only be recovered when "they are made reasonably certain by proof of actual facts, with present data for a rational estimate of their amount." Id. (quotations and citation omitted).

The proof required to sustain lost profits is "exacting." Ozark Employment Specialists, Inc. v. Beeman, 80 S.W.3d 882, 897 (Mo. Ct. App. 2002). "[C]ompetent and substantial evidence is required to support an award of damages." Id. Moreover, "[s]peculation as to probable or expected lost business profits is spurned," id., and "[a]n unsupported opinion or estimate of a loss of profits is generally held to be insufficient." Farris v. Mitchell, 745 S.W.2d 262, 264 (Mo. Ct. App. 1988).

For established businesses, "proof of the income and expenses of the business for a reasonable time anterior to its interruption, with a consequent establishing of the net profits during the previous period, is indispensable." Coonis, 429 S.W.2d at 714 (quotations and citation omitted). In Independent Business Forms, Inc. v. A-M Graphics, Inc., 127 F.3d 698 (8th Cir. 1997), this court noted that it is nevertheless possible for new businesses to recover lost profits:

This Court has observed that: "[U]nder Missouri law there is no per se rule that a so-called 'new' business may not, regardless of the facts and circumstances, recover for loss of net profits or net gain." Handi Caddy, Inc. v. American Home Products Corp., 557 F.2d 136, 139 (8th Cir. 1977). While the general rule requiring proof of expected profits with reasonable certainty places a greater burden upon a newly established business, it does not mean a new business can never recover lost profits.

Id. at 703. Thus, while new businesses "labor[] under a greater burden of proof in overcoming the general rule that evidence of expected profits is too speculative, uncertain, and remote to be considered," Handi Caddy, 557 F.2d at 139, lost profits may nevertheless be recovered if "they are made reasonably certain by proof of actual facts, with present data for a rational estimate of their amount." Coonis, 429 S.W.2d at 714 (quotations and citation omitted).[4]

Given this difficult standard, we hold that Tipton did not prove lost profits with reasonable certainty. Essentially, Tipton's theory of lost profit damages was that in light of "increased growth" in the area, Mill Creek would have been able to sell all

---

[4]Citing two Missouri cases, the Kelleys insist that even new businesses must show a history of profits prior to interruption in order to recover lost profits. See Anderson v. Abernathy, 339 S.W.2d 817, 824 (Mo. 1960) (noting that as a new business, plaintiff did not have a history of profits and holding that "[i]n any event, there was not sufficient proof of facts and data"); Lowder v. Mo. Baptist Coll., 752 S.W.2d 425, 428 (Mo. Ct. App. 1988). We do not believe, however, that this is the proper rule. First of all, Coonis v. Rogers, 429 S.W.2d at 714, which was decided after Anderson, clearly states that proof of profits prior to interruption is "indispensable" only for *established* businesses. Id. Second, the Kelleys' theory contradicts the reasoning of Handi Caddy, 557 F.2d at 139, and Independent Business Forms, 127 F.3d at 703, which only require new businesses to prove expected profits with a "reasonable certainty." Finally, such a rule seems illogical on its face, given that new businesses, by definition, will not have any prior profits.

the gravel and dirt within the mine plans for an enormous profit.[5]  He introduced the following evidence to support this theory at trial: 1) that there was gravel and top-soil available to Mill Creek; 2) that the market value for gravel was $10 per yard, and $14 per yard for top-soil; 3) that the gravel available to Mill Creek could be used for some construction and landscaping purposes; 4) that one purchaser would have bought Mill Creek gravel for future projects, but he did not say how much; and 5) that there would be a demand for the gravel due to the growth of the area and the nearby construction of two four-lane highways.

This evidence was insufficient under Missouri law to support the jury's lost profits award.  Tipton never showed that Mill Creek was "reasonably certain" to make *any* profit, much less the $1.5 million profit that the jury awarded (or the $14 million profit that Tipton claimed was actually lost).  The primary problem with Tipton's evidence was that his entire profits calculation was based on the proposition that there would be an increased demand for gravel in the area at some time in the future.

---

[5]We note that the principal case that Tipton relies upon in this appeal, State ex rel. State Highway Comm'n v. Foeller, 396 S.W.2d 714 (Mo. 1965), does not deal with lost profits at all, but with a condemnation proceeding.  Tipton relies on that case for the proposition that

> all that is required is testimony about the value of the mineral, present and future expected demand for the mineral, and evidence of every use to which the mineral may be put, regardless of whether the mineral has been so used and regardless of the owner's present intentions to devote the mineral to such use.

(Appellee's Br. at 40.)  While this may be all that is required in the condemnation context, we find that under Coonis and subsequent cases, the burden of proof for showing lost profits is much higher.  For one thing, to recover lost profits, one must show not only the hypothetical value of a resource as it sits in the ground, but that profits can be produced through actual sales.  This is exactly the part of the equation that Tipton failed to prove.

Projecting $14 million in lost profits upon a future demand that does not yet exist is exactly the kind of conjectural assumption that is disfavored by all Missouri courts that have addressed the issue of lost profits.[6]

Even if such growth did occur, it is still a matter of speculation as to whether this increased demand would create business for Mill Creek. Presumably, the corporation would need to bid for contracts along with its competitors, and there is no guarantee that it would win any contracts that would create profits. In fact, the evidence suggests that Mill Creek would have been at a competitive disadvantage in

_____

[6]Missouri courts have consistently rejected projections when they are based upon assumptions or hopeful expectations. As stated above, "[s]peculation as to probable or expected lost business profits is spurned, and proof of lost profits must be substantial." Ozark Employment Specialists, 80 S.W.3d at 897; see also Gesellschaft Fur Geratebau v. GFG America Gas Detection, Ltd., 967 S.W.2d 144, 147 (Mo. Ct. App. 1998) (reversing the jury's judgment for lost profit damages because the plaintiff only offered "projections that were calculated on neither any actual sales nor revenue"); Brown v. McIbs, Inc., 722 S.W.2d 337, 341 (Mo. Ct. App. 1986) (rejecting lost profits and stating that "evidence of lost profits must be sufficiently definite and certain so as to allow a reasonably accurate estimate of the loss without resorting to speculation"). Similarly, other jurisdictions require that lost profits be supported by the existence of future contracts from which lost profits can actually be calculated. See Edmunds v. Sanders, 2 S.W.3d 697, 705 (Tex. App. 1999) ("[T]o recover lost profits, a party must show either a history of profitability or the actual existence of future contracts from which lost profits can be calculated with reasonable certainty."); Kidder, Peabody & Co., Inc. v. IAG Int'l Acceptance Group N.V., 28 F. Supp. 2d 126, 131-34 (S.D.N.Y. 1998) (denying lost profits where plaintiff could not "identify a single contract or a single potential transaction in which [it] was involved from which lost profits can be derived," and holding that lost profits could not be based "upon a variety of assumptions about hypothetical deals"). While Missouri law does not appear to require a plaintiff to identify actual contracts from which lost profits can be derived, it does require "substantial" evidence, Ozark Employment Specialists, 80 S.W.3d at 897, and these cases serve to demonstrate just how far Tipton was from being able to meet this standard.

this regard because of the high clay content of the gravel, the sharpness of the gravel, the porousness of the gravel, the limited uses to which the gravel could be put, and the inferior roads over which Mill Creek trucks would need to travel.[7]

---

[7]Tipton's own expert was very damaging in this respect. The expert's report concludes that Mill Creek faced many disadvantages:

> Gravel quality insofar as a potential source of construction aggregate, which constitutes a significant, prospective long-term consumer of acceptable rock products, appears somewhat diminished by the preponderance of relatively porous chert and abundance of clay in the deposits. Inquiry made with the Missouri Department of Transportation (MoDOT) regional office in Joplin, Missouri revealed that gravel deposits in general in McDonald County are not utilized for their construction projects due to high absorption characteristics . . . Other potential uses of gravel resources [exist], . . . but it is believed such uses would be comparatively sporadic and subject to prevailing market conditions in the area. Moreover, the high clay content of the colluvial deposits necessitates an additional step [to] . . . mechanically agitate[] the gravel to remove undesired clay coatings and clay balls. . . . [T]he additional step undoubtably increases processing costs, which likely places such deposits at an economic disadvantage with in-stream operations, which mine inherently "clean" alluvial deposits.

(J.A. at 139-40.) The report goes on to say that:

> Currently, there are five other legally permitted sand and gravel operations in McDonald County . . . . Each of the five sites lay in closer proximity to improved roads than the Edwin Kelley property, suggesting higher visibility to the general public and, possibly, lower truck transportation costs.

(J.A. at 140.)

Furthermore, Tipton was able to produce almost no evidence that any buyer would purchase Mill Creek gravel.[8]  Many buyers flatly refused to buy the gravel because of its inferior quality.  The undisputed evidence was that the corporation had no contracts to sell gravel, even though Tipton and other Mill Creek employees dedicated some time attempting to secure contracts for the gravel that would be forthcoming from the mine.  Despite these efforts, only a small amount of the paltry eighty tons of gravel produced by the mine was ever sold.  Given these deficiencies, Tipton's assertion that Mill Creek would have sold all of the rock and dirt existent on the property for a sum total of $14 million in profits strikes us as wishful thinking.

Thus, we hold that, in light of the difficult standard for proving lost profits under Missouri law, the evidence was insufficient for a reasonable jury to find that Mill Creek—a corporation that was $700,000 in debt, had sold almost none of its product, and had a product that many purchasers were not interested in buying—was "reasonably certain" to make a profit.

The evidence suggests, however, that there was some smaller amount of actual damage to the corporation, such as the Kelleys' sale of corporation equipment for their own personal benefit, sale of land that the corporation intended to mine, and the small sales of gravel from the eighty-ton pile that were not remitted to the corporation.  We also hold that Mill Creek may be entitled to recover the loss it incurred to get its gravel operation up and running in reliance on the pre-incorporation agreement.  See Restatement (Second) of Contracts § 349 (1981) ("As an alternative to the measure of damages stated in § 347 [expectation damages], the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance . . ."); see also John D. Calamari,

---

[8]Tipton had only one witness, Pat Adams, testify that he would have bought gravel from Mill Creek, but he did not say how much gravel he would have bought or at what price.

The Law of Contracts 556 (4th ed. West 1998) ("When the aggrieved party cannot establish a loss of profits with sufficient certainty, the party may recover expenses of preparation and of part performance, as well as other foreseeable expenses incurred in reliance upon the contract."). Because the jury did not identify or distinguish these other breach of contract damages from the lost profit damages in its $1.5 million award to the corporation, we find it is necessary to remand the case for a new trial on damages to calculate the amount due to the corporation without consideration of lost profits.

*Evidentiary Issues*

The Kelleys also appeal the district court's denial of their motion for a new trial. They argue that the district court made a number of erroneous and prejudicial evidentiary rulings, including: 1) allowing Tipton's counsel to improperly use misleading charts summarizing Tipton's alleged lost profits damages in closing arguments; 2) allowing Tipton to present damage calculations that were not disclosed in accordance with Federal Rule of Civil Procedure 26; 3) admitting the appraisal report of Dean Seimer, and allowing Tipton to make improper use of that report; and 4) allowing Tipton's counsel to improperly summarize Mikel Carlson's expert report in closing arguments. They argue that they are entitled to a new trial on the basis of these errors. These evidentiary rulings, however, all relate to the "lost profits" issue. Because we hold that the evidence in this case was not sufficient to support an award for lost profits, and remand for a new trial on damages not including lost profits, we do not need to decide whether the district court abused its discretion as to these rulings.

*Jury Instruction*

The Kelleys argue that the jury instruction on breach of contract constituted an improper "roving commission," allowing the jury "to find breach of contract in a

-13-

variety of unidentified factors without limitation to the facts and law developed in the case and without regard to what acts or omissions would constitute liability." (Appellant's Br. at 47.)  We do not, as a matter of law, find any problem with the instruction.[9]

The district court has broad discretion in the formulation of jury instructions, and "[a] judgment will be reversed on the basis of an instructional error only if the error affected the substantive rights of the parties." Gasper v. Wal-Mart Stores, Inc., 270 F.3d 1196, 1200 (8th Cir. 2001).  "The test is whether the instructions given, taken as a whole and viewed in the light of the evidence and the applicable law, fairly

_____

[9]The instruction provides that:

On Mill Creek Gravel, Inc.'s claim for breach of contract brought by plaintiff Tipton, your verdict must be for Mill Creek Gravel, Inc. and against defendants Ed and Dixie Kelley if you believe:

First, defendants Ed and Dixie Kelley agreed they shall lease to Mill Creek Gravel, Inc. adequate property for mining operations and in consideration Mill Creek Gravel, Inc. agreed to pay to Ed and Dixie Kelley 50¢ per yard for each yard of gravel, top soil, or fill dirt removed from the property, and

Second, Mill Creek Gravel, Inc. was ready, willing, and able to perform under the terms of the agreement, and

Third, defendants Ed and Dixie Kelley prevented Mill Creek Gravel, Inc. from performing mining operations, and

Fourth, because of defendants Ed and Dixie Kelley's failure to perform the agreement Mill Creek Gravel, Inc. was damaged.

(J.A. at 5.)

-14-

and adequately submitted the issues in the case to the jury." Id. (quotations and citation omitted).

Here, the Kelleys claim that a more specific instruction was needed regarding exactly how the Kelleys prevented Mill Creek's performance. We cannot understand, however, why a more specific instruction was necessary, or why the jury should have been prohibited from entertaining all of the evidence before it in deciding whether there was a breach. We therefore hold that the instruction was not a roving commission, but that in light of the evidence and the applicable law, the district court fairly and adequately submitted the issue to the jury.

*Attorney Fees and Costs*

The sole basis on which the Kelleys contest the district court's award of attorney fees is that Tipton failed to plead them as special damages in his Complaint. See Nat'l Liberty Corp. v. Wal-Mart Stores, Inc., 120 F.3d 913, 916 (8th Cir. 1997). We find that a grant of attorney fees was appropriate in this case for the simple reason that shifting the attorney fees of a successful plaintiff in a shareholder derivative suit to the corporation is not a "special damage" within the meaning of Rule 9(g),[10] but is a judge created exception based on equitable principles. See Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 391-92 (1970). Because shareholder derivative suits are

---

[10] "Special damages" are those types of damages that, although resulting from the wrongful act, are not usually associated with the claim in question and must be plead in order to avoid unfair surprise to the defendant. See Avitia v. Metro. Club of Chicago, Inc., 49 F.3d 1219, 1226 (7th Cir. 1995) (defining special damages as "damages that are unusual for the type of claim in question–that are not the natural damages associated with such a claim"). Courts have held attorney fees to be special damages primarily in instances when available under a contract between the parties. See Nat'l Liberty, 120 F.3d at 916 (attorney fees available under an agreement between the parties constitute special damages that must be pled under 9(g)); Maidmore Realty Co., Inc. v. Maidmore Realty Co., Inc., 474 F.2d 840, 843 (3d Cir. 1973) (attorney fees available under contract are special damages).

brought on behalf of the corporation, courts reason that the corporation should pay for any benefit it receives as a result of the suit. Id. at 395. Accordingly, Tipton was not required to plead such fees as special damages in his Complaint, but could raise the issue of fees, as he did, by motion under Federal Rule of Civil Procedure 54(d)(2).[11]

Thus, we agree with the district court that Tipton is entitled to attorney fees and costs. We do not agree with the district court, however, as to the amount Tipton should be awarded. In light of our ruling as to lost profits, we hold that no attorney fees or costs should be awarded for the time and expenses spent on Tipton's lost profit claim. We believe that a recalculation of attorney fees and costs[12] that does not include the time and expense spent on proof of lost profits would more accurately represent the degree of success achieved by Tipton's attorney and the benefit afforded to the corporation.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the decision of the district court in regard to the breach of the pre-incorporation agreement and the jury instruction on breach of the agreement. However, we VACATE the district court's decision in regard to lost profits, attorney fees, and costs, and REMAND the case for a new trial

---

[11]Federal Rule of Civil Procedure 54(d)(2)(a) provides that "[c]laims for attorneys' fees and related non-taxable expenses shall be made by motion unless the substantive law governing the action provides for the recovery of such fees as an element of damages to be proved at trial."

[12]Consistent with this ruling, Tipton is not entitled to the costs for his expert witnesses on lost profits, Jay McIntyre and Mikel Carlson. We therefore do not need to reach the issue, raised by the Kelleys on appeal, of whether the district court erred with respect to its award of costs for these witnesses.

on damages without consideration of lost profits, and for a recalculation of attorney fees and costs, excluding time and expenses spent on proof of lost profits.

IT IS SO ORDERED.

_____