**UNITED STATES of America,**
**Plaintiff,**

v.

**Richard MUSAL, Defendant.**

No. 4:02–CV–40449–JEG.

United States District Court,
S.D. Iowa,
Central Division.

Jan. 25, 2006.

Harold N. Schneebeck, Jr., Brown Winick Graves Gross Baskerville & Schoenebaum PLC, West Des Moines, IA, for Plaintiff.

Anne Norris Graham, USDOJ Tax Division, Laquita Taylor Phillips, US Dept of Justice, Washington, DC, for Defendant.

### ORDER

GRITZNER, District Judge.

Before the Court is Defendant Richard Musal's Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial, which the Government resists. Neither party has requested a hearing, and the Court finds that a hearing is unnecessary. For the reasons discussed below, Musal's motions must be denied.

### SUMMARY OF MATERIAL FACTS

Access Air, Inc. ("Access Air"), was a corporation that provided commercial passenger air transportation throughout areas of the continental United States. Access Air was a wholly owned subsidiary of Ac-

cess Air Holdings, Inc. ("Holdings"). The operations of Access Air were essentially one and the same as Holdings, and the Board of Directors of Holdings[1] acted as the Board of Directors of Access Air.

Donald Roger Ferguson ("Ferguson") was Chief Executive Officer of Holdings, President of Access Air, and a board member of Holdings. As of February 1999, Ferguson's job entailed having schedules ready and management in place to operate the airline. Frank Rosenberg served as an interim COO for about two to three weeks in April or May of 1999; when Rosenberg left, Ferguson resumed the position of CEO as well as COO of Access Air. At this time, Ferguson assumed responsibility for passenger service, marketing, and fulfilling the operations of the airline. As CEO, he had all of the responsibility for operations, which included financing. Ferguson as CEO reported to the Board of Directors

Richard Musal ("Musal") first began employment with Holdings in July 1996 when Ferguson hired him as Chief Financial Officer ("CFO"). Musal was the incorporator of Access Air and was appointed CFO of Access Air at its inception. Musal was on the Board of Directors of Access Air during his tenure with the airline and served as Treasurer of Holdings and Access Air. Musal also owned stock in Holdings. Musal in his capacity as CFO oversaw all the financial aspects of Access Air. Musal as CFO reported to Ferguson until August of 1999. Musal assumed the titles of President and COO of Access Air and Holdings some time in late July/early August of 1999,[2] and after August, Musal reported directly to the Board of Directors.

Nicholas P. Miller ("Miller") was hired by Musal as controller of Access Air.[3] Miller as controller was responsible for protecting the company assets, paying debts, and maintaining an accounting for assets and debts. Miller's duties entailed signatory power over Access Air's accounts, payment of accounts if funds were available, and supervisory power over the assistant controller, accountants, and payroll supervisor. Musal was Miller's boss with direct authority over Miller at all times during the period in question, and Miller reported directly to Musal.

Operations for Access Air commenced on February 3, 1999. From the very start of operations, Access Air was plagued with financial problems, and the corporation filed for bankruptcy protection on November 29, 1999.

This litigation arises out of Access Air's failure to pay over to the IRS excise taxes that were collected on the sale of airline tickets. The Internal Revenue Code provides for a tax on amounts paid for the taxable transportation of persons by air. 26 U.S.C. § 4261. The customer purchasing the airline ticket is responsible for paying the tax, and the tax is generally included in the purchase price of the airline ticket. The tax is calculated based

---

1. The members of the Board of Directors were Donald Ferguson, John Ruan III, Fred Weitz, Tom Gibson, Gerry Shaheen, Jim Davis, Frank Rosenberg, Joe O'Brien, Richard Musal, and an individual from Mid–American Energy.

2. Musal held these positions until February 29, 2000.

3. The Government claims that Miller was hired as the controller and eventually became the CFO. Miller denies that he was ever CFO. The record shows that at some point in 1999 Musal asked Miller if he would be willing to serve as CFO of Access Air. Miller indicated a willingness to assume the CFO position; however, he never became CFO because the appointment would have required the approval of the Board of Directors. Musal testified that Miller possibly signed some documents as CFO but that he was never formally an officer or a director of the company.

upon a percentage of the ticket's price plus a flat rate per each domestic flight segment.[4] The taxes paid by the customer belong to the United States and "shall be held to be a special fund in trust for the United States." 26 U.S.C. § 7501. If these funds are not remitted to the United States,

[a]ny person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a).

The Internal Revenue Service assessed unpaid excise taxes in the amount of $1,404,404.09 in total for the second, third, and fourth quarters of 1999. The amount of unpaid excise tax was calculated by Revenue Agent Jerry Robertson from a worksheet, later marked as Trial Exhibit 4050, provided to him by Access Air. In accordance with 26 U.S.C. § 6672, a delegate of the Secretary of the Treasury assessed a trust fund recovery penalty in the amount of $1,300,552.09 against Ferguson, Musal, and Miller for the tax periods ending June 30, 1999, September 30, 1999, and December 31, 1999.

On or about February 13, 2002, Ferguson timely filed a Form 843 claim for refund for the tax periods ending June 30, 1999, September 30, 1999, and December 31, 1999. Each of Ferguson's claims for refund was for $20 for each relevant tax period, for a total of $60. The IRS denied Ferguson's claims for refund. On September 5, 2002, Ferguson filed a Complaint in United States District Court stating that he overpaid the trust fund recovery penalty for the second, third, and fourth quarter 1999 tax periods and requesting judgment in his favor on his claim for relief against the Government in the amount of $60.00, together with interest thereon, his costs of this action, and other such relief as the Court may deem appropriate, including an award of attorney's fees under 26 U.S.C. § 7430. The Government then brought a counterclaim against Ferguson, adding Musal and Miller as additional counterclaim defendants, seeking to reduce to judgment the assessed trust fund recovery penalties, asserting that they were each a person required to collect, truthfully account for, and pay over to the United States the unpaid federal excise taxes imposed under 26 U.S.C. § 4261 on the amounts paid to Access Air for air transportation, and that each willfully failed to collect or truthfully account for and pay over the excise taxes.

On May 6, 2004, the Court entered an Order granting the Government's cross-motion for summary judgment against Musal, with the Court finding Musal was a responsible person under the statute. On May 7, 2004, Musal filed a Motion to Amend, requesting that the Court amend the May 6, 2004, Order and allow Musal to proceed to trial on the issue of the accuracy of the IRS assessment amount. On May 18, 2004, the Court entered an Order denying Musal's motion To Amend, finding that all of the arguments Musal offered in support of his Motion to Amend were presented during the summary judgment

---

**4.** The rates of tax applicable for 1999 are as follows:

| Domestic segments beginning | Rate of passenger tax | Per flight segment charge |
|---|---|---|
| After 9/30/98 and before 10/1/99 | 8% | $2.00 |
| After 9/30/99 and before 2000 | 7.5% | $2.25 |

stage of the litigation and considered by the Court at that time. The Court further noted that Musal offered no evidence to demonstrate that any manifest errors of law or fact, or any newly discovered evidence, existed. The Court held that relief under Rule 59(e) was not appropriate.

A jury trial on Ferguson's refund claim and the Government's counterclaims against Ferguson and Miller began on May 24, 2004. On May 26, 2004, at the close of Ferguson and Miller's case in chief, the Government moved for judgment as a matter of law as to Ferguson's claim for a refund. After hearing argument from counsel, the Court granted the Government's motion, and Ferguson's claim for a refund was dismissed. On May 28, 2004, the jury returned its verdict, finding Ferguson to be a responsible person who willfully failed to account for and pay over Access Air's excise taxes for the second and third quarter of 1999. The jury further found that the second and third quarters' assessed excise taxes were erroneous and excessive. The jury determined that the amount of the excise taxes owed were $47,521.11 for the second quarter and $48,043.32 for the third quarter. The jury found that Ferguson was not a responsible person during the fourth quarter of 1999. The jury found Nicholas Miller was not a responsible person under the statute.

On June 7, 2004, Richard Musal filed a Motion to Reconsider, requesting that the Court vacate portions of the May 6, 2004, and May 18, 2004, Orders and grant Musal the opportunity to proceed to trial with respect to the sole issue of the accuracy of the penalty assessment amounts. The Court concluded that relief under Rule 60(b)(6), which provides relief for "any other reason justifying relief from the operation of judgment," was appropriate given the circumstances, finding that an inherent unfairness to Musal would result, especially considering the joint and several nature

of the penalty assessment liability, were he left unable to obtain relief. Musal was therefore relieved from liability for the IRS certified assessment amounts, with the Court granting Musal Rule 60(b)(6) relief only as to those portions of the May 6, 2004, and May 18, 2004, Orders which found that the Court could not conclude that relying on Access Air's own records was an unreasonable method for determining the corporation's tax debt or that Musal failed to carry his burden of establishing that the assessments made against him were erroneous. Musal was provided no relief from the remainder of those orders which found Musal a responsible person who acted willfully. The Court set a dispositive motion deadline and set for trial the sole issue of the accuracy of the second, third, and fourth quarter penalty assessment amounts.

On December 7, 2004, Musal filed a Motion for Partial Summary Judgment, asserting that collateral estoppel applied and that the Government should be precluded from retrying the issues relating to the amount of the trust fund recovery penalty assessments for the second and third quarters of 1999. The Government did not oppose Musal's request that the doctrine of collateral estoppel be applied to the amount of the trust fund recovery penalty assessments for the second and third quarters of 1999. In an Order dated February 14, 2005, the Court found collateral estoppel was appropriate with regard to the second and third quarter assessments amounts and that Musal was entitled to judgment as a matter of law as to the assessment amounts for the second and third quarters of 1999.

The only issue that remained for trial was the accuracy of the fourth quarter penalty assessment amount. Trial began on July 25, 2005. The jury returned its verdict on July 27, 2005, finding Musal had

not proven the assessed excise tax for the fourth quarter was erroneous and excessive.

Judgment against Musal for the fourth quarter assessment amount was entered in the case on July 29, 2005. On August 3, 2005, Musal filed a Motion for Judgment as a Matter of Law and Motion for New Trial. Musal argues that the presumption of correctness does not apply because there is no legally admitted evidence supporting the assessment and that the Government has failed to prove that any tax is due and owing with respect to the fourth quarter. Musal states that in the alternative, the Court should grant him a new trial with respect to the fourth quarter assessment amount.

The Government resists Musal's motion, claiming the evidence presented to the jury showed the IRS assessment was reasonable and that, if anything, it was an under-statement of the excise tax Access Air owed. The Government further contends there was simply no evidence to support Musal's position that the fourth quarter assessment was erroneous and excessive, stating the jury's verdict was more than reasonable. The Government requests that the Court deny Musal's motion and allow the verdict to stand.

## APPLICABLE LAW AND DISCUSSION

### I. Motion for Judgment as a Matter of Law

■ "Judgment as a matter of law is appropriate when there is no legally sufficient evidentiary basis for a reasonable jury to find for that party." *Wash Solutions, Inc. v. PDQ Mfg., Inc.*, 395 F.3d 888, 892 (8th Cir.2005) (quoting Fed.R.Civ.P. 50(a)(1); *Tipton v. Mill Creek Gravel, Inc.*, 373 F.3d 913, 917 (8th Cir.2004)) (quotations omitted). "A jury verdict must be affirmed unless, viewing the evidence in the light most favorable to the prevailing

party, we conclude that a reasonable jury could have not found for that party." *Webner v. Titan Distrib., Inc.*, 267 F.3d 828, 833 (8th Cir.2001) (quoting *Cross v. Cleaver*, 142 F.3d 1059, 1066 (8th Cir. 1998)). Viewing the evidence presented at the second trial in the light most favorable to the Government, a reasonable jury could find that the assessment amount was not erroneous and excessive.

■ Musal bases his argument for judgment as a matter of law on three evidentiary rulings made by the Court regarding testimony and evidence the Government offered at trial. "Admissibility of evidence is reviewed for abuse of discretion." *Crump v. Versa Products, Inc.*, 400 F.3d 1104, 1109 (8th Cir.2005) (citing *Drabik v. Stanley–Bostitch, Inc.*, 997 F.2d 496, 508 (8th Cir.1993)); *see also Amtrust Inc. v. Larson*, 388 F.3d 594, 597–598 (8th Cir. 2004) (rulings on admissibility of trial evidence reviewed for an abuse of discretion).

### A. Exhibit 4050

■ Musal asserts it is undisputed that the sole basis for the assessment is the worksheet provided by Charles Collins, Access Air's accounting manager, to Robertson. Musal claims this worksheet, marked as Trial Exhibit 4050, does not provide a legally sufficient basis for the assessment and therefore the assessment should have been declared to be "naked".

■ A naked assessment is one where the records supporting the assessment are excluded from evidence or are nonexistent. *United States v. Schroeder*, 900 F.2d 1144, 1149 (7th Cir.1990) (citing *United States v. Janis*, 428 U.S. 433, 441, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *Coleman v. United States*, 704 F.2d 326 (6th Cir.1983)). Under the circumstances established in the record, the financial affairs of Access Air were in substantial disorder. The company was experiencing difficulty in obtaining

reasonable information about ticket sales and revenues. The computer system installed for this purpose was providing inconsistent and questionable information. With financial managers on the inside of the company struggling to identify their financial posture, the IRS investigator approached the problem by asking the then current manager of the finance department at Access Air to provide information applicable to the tax liability.

In response to the investigator's request, Access Air supplied Exhibit 4050 to Robertson, knowing Robertson intended to use it in his excise tax investigation. The IRS' reliance on this spreadsheet was a reasonable means of at least establishing what Access Air personnel projected as the liability. While minimal support was utilized by the IRS in determining the correct penalty assessment amount, it is clear the IRS used Exhibit 4050 in reaching its assessment amount, and Exhibit 4050 was a part of the evidence in the trial of this case. While the IRS may not normally rely solely on the projection of the taxpayer, the difficulty in obtaining information to verify or rebut those projections, given the state of Access Air, left few options. Given that the assessment was based upon the opinion of a financial manager for the taxpayer, derived from internal accounting systems, however impaired, the Court does not find the assessment constitutes a naked assessment.

Musal also contends, as he did at trial, that Exhibit 4050, and the information contained therein, is hearsay and inadmissible in this proceeding. Musal claims that no foundation was ever laid by the Government to support any exception to the hearsay rule.

■ The Government argues that Exhibit 4050 is excepted from the hearsay rule under Fed.R.Evid. 804(b)(3). In its Resistance to Musal's Renewed Motion, the Government implies that Chuck Collins

prepared Exhibit 4050, and therefore as Access Air's agent his statements against Access Air's interests are admissible under Rule 804(b)(3). On the second day of trial, Government counsel stated that in fact it had discovered that Gorden Rosen, and not Chuck Collins, prepared Exhibit 4050. Exhibit 4050 was in no way against Rosen's pecuniary or proprietary interest, nor did it tend to subject him to civil or criminal liability, as he was merely hired to examine the accounting, and he had no stake or interest in the outcome of the accounting of Access Air. Exhibit 4050 is therefore not excepted from the hearsay rule by operation of Rule 804(b)(3).

■ The Government also argues that Exhibit 4050 is admissible under Fed. R.Evid. 807. While the Government made Exhibit 4050 known to Musal sufficiently in advance of the trial, regardless of the timing of its own discovery of the true identity of the declarant, it did not provide to Musal the name and address of the declarant sufficiently in advance of trial, which is part of the notice requirement under the rule. "The notice requirements of the residual hearsay rule are strictly construed." *Sours v. Glanz*, 24 Fed.Appx. 912, 914 (10th Cir.2001) (citing *United States v. Heyward*, 729 F.2d 297, 299 n. 1 (4th Cir.1984)). "[C]ourts have refused to admit hearsay evidence under the rule solely because the proponent failed to provide the opposing party with the name and address of the declarant." *Id.* (citing *Akzo Coatings, Inc. v. Aigner Corp.*, 881 F.Supp. 1202, 1212 (N.D.Ind.1994), *aff'd in part, vacated in part by Akzo Nobel Coatings, Inc. v. Aigner Corp.*, 197 F.3d 302 (7th Cir.1999)). The notice requirement of Rule 807 was not met by the Government, and Exhibit 4050 therefore cannot be admitted under the residual exception.

■ The Government also argues that Exhibit 4050 is not hearsay because it was

not offered to prove the truth of the statements contained therein. This was the essence of the Court's ruling during the trial.

On the second day of trial, the Court indicated for the record and outside the presence of the jury that Exhibit 4050 was central to the circumstances of the case because it was essentially everything the IRS had relied upon in determining the trust fund recovery penalty assessment, and thus the exhibit was being admitted into evidence over Musal's objections. The Court went on to state that Exhibit 4050 was being admitted into evidence not because it was accurate but rather because it is in fact the document the IRS had relied upon. The Court found the exhibit did not constitute hearsay because it was not being offered to prove the truth of financial information contained in the document, but rather it was being offered to show what information the IRS had relied upon in the process of reaching its assessment amount.

"When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." Fed.R.Evid. 105. Pursuant to that authority, Musal requested that the Court give a limiting instruction to the jury regarding Exhibit 4050. That request was denied because in addition to finding that Exhibit 4050 was not hearsay for the above stated reason, the Court regarded Exhibit 4050 as some of the available evidence, albeit challenged evidence, of what the assessment should have been. The Court concluded a limiting instruction could be confusing to the jury as it could unduly limit the purposes for

which the jury could consider Exhibit 4050. Musal argues that the absence of a limiting instruction allowed the jury to consider Exhibit 4050 as evidence of the truth of the matter set forth therein, i.e., the amount of tax liability for the fourth quarter of 1999.

■ Exhibit 4050 was some evidence of the best approximation by Access Air of the excise taxes owed, thus it was some evidence of the underlying fact. The Court continues to find a limiting instruction would have been essentially inaccurate and potentially confusing to the jury under these unusual circumstances. However, even if a limiting instruction should have been provided, ample evidence in addition to Exhibit 4050 was presented at trial which supports the jury's verdict that the assessment amount was not excessive and erroneous, thus the use of a limiting instruction on this record would have been of little impact, and any error would not have altered the outcome.

A balance sheet dated September 30, 1999, shows accrued excise taxes in the amount of $1,069,493.89 and accrued segment fee tax liability in the amount of $418,348.00.[5] Total passenger revenue for the month of September 1999 was listed as $1,358,320.02, and total passenger revenue for the 1999 year to date was listed as $10,407,994.27. Minutes of the November 19, 1999, meeting of the Board of Directors indicate that Musal informed the Board that certain taxes were owing, including excise taxes.[6] An Access Air balance sheet dated November 30, 1999, has accrued excise taxes listed in the amount of $1,069,317.62 and accrued segment fee tax liability listed in the amount of $418,280.00.[7]

---

5. Trial Exhibit 4018.

6. Trial Exhibit 4034.

7. Trial Exhibit 4019.

In a memo dated November 22, 1999, John Shors indicated that Musal presented to the Board a financial projection showing that if the company received an infusion of $2.5–million in cash, $500,000 of that would be available to pay down the taxes, and the remaining taxes could be brought up to date within the confines of the Chapter 11 bankruptcy plan.[8] This memo supports the inference that Musal was aware that the amount of taxes owing was more than $500,000. Richard Musal sent a memo to the Board of Directors on December 13, 1999.[9] Attached to this memo is an estimate of the necessary capital required in order to restart flight service. This estimate included the costs associated with the unpaid excise taxes, with costs of these excise taxes being listed by Musal as being in the range of $1,500,000.00 to $2,000,000.00, showing that Musal himself had knowledge that the excise taxes owed by Access Air exceeded $1.3–million.

The minutes from the March 1, 2000, Board of Directors meeting state that Mike Pankow, an attorney specializing in aircraft financing and bankruptcy, indicated to the board that there were excise taxes owing of about $1,350,000.[10] This constitutes further evidence that the records available to Access Air were showing excise taxes owing in an amount very close to the amount actually assessed by the IRS, based upon the data provided by Access Air.

At trial, Musal argued that the penalty assessed by the IRS must be inaccurate because Access Air would have had to have generated revenue in the amount of approximately $13–million in order to owe excise taxes in excess of $1.3–million. At the time of the bankruptcy filing, Musal signed a declaration concerning Access Air's bankruptcy schedules, declaring under the penalty of perjury that the schedules were true and correct to the best of his knowledge, information, and belief. The Statement of Financial Affairs that was submitted to the Bankruptcy Court states that Access Air had income from passenger revenue in the amount of $13,956,820.27. Schedule E of the Summary of Schedules submitted to the Bankruptcy Court, which lists creditors holding unsecured priority claims, lists excise taxes owing in the amount of $1,724,630 and segment fees owing in the amount of $390,850, figures providing further support for the jury's finding that the assessment was not erroneous and excessive.

The jury was also shown the segment data Access Air submitted to the U.S. Department of Transportation.[11] This spreadsheet shows that in 1999, 19,961 segments were flown in September; 23,050 segments were flown in October; and 23,440 segments were flown in November. Using these figures, the segment tax for September would have been $39,922.00 (19,961 × $2.00); $51,862.50 (23,050 × $2.25) for October; and $52,740.00 (23,440 × $2.25) for November. This appraisal of the segment tax, calculated using the segment figures reported to the DOT by Access Air itself, results in segment tax amounts that are in *excess* of that reflected on Exhibit 4050, further evidence in support of the Government's position that the assessment was not excessive.[12]

 "The Commissioner's assessment is expected to be rational, not flawless." *Caulfield v. Comm'r of Internal Revenue*, 33 F.3d 991, 993 (8th Cir.1994)

8. Trial Exhibit 72.

9. Trial Exhibit 47.

10. Trial Exhibit 4087.

11. Trial Exhibit 4500.

12. Exhibit 4050 lists the segment tax as $39,096.00 for September, $41,050.80 for October, and $43,103.34 for November.

(quoting *Dodge v. Comm'r,* 981 F.2d 350, 353 (8th Cir.1992), *cert. denied,* 510 U.S. 812, 114 S.Ct. 58, 126 L.Ed.2d 28 (1993) (quotations omitted)). Although the IRS may have only relied on Exhibit 4050 in making its assessment, the fact remains this is the only document Access Air provided to the IRS at the time the assessment was being made. The evidence presented at trial in addition to Exhibit 4050 supports the jury determination that the IRS assessment was neither erroneous or excessive. The jury's verdict· that the amount assessed by the IRS for the fourth quarter, $452,934.85, was not erroneous or excessive finds support in the record.[13]

### B. Gordon Rosen's Testimony

■ Musal contends that Gorden Rosen, the president of ARM Software, the company that provided the accounting software utilized by Access Air, should not have testified at all in this trial, and that the Court was required to follow Judge Shields' December 3, 2004, Order and exclude any testimony from Rosen. Musal argues there is no basis for determining that Judge Shields' Order excluding Rosen was clearly erroneous as contrary to law and therefore the Court erred in reconsidering the issue and allowing Rosen to testify.

The Government asserts that Judge Shields' statement that Rosen would not be permitted to testify at trial was not a ruling of the court but dicta, claiming that the only issue before Judge Shields was whether or not the United States would be granted leave to take trial depositions, not whether the United States would be permitted to call Rosen to the stand at trial.

In his initial Resistance to the Government's Motion to Take Trial Depositions, Musal noted that Rosen was a person with general knowledge relating to the management of Access Air and to the duties, authority, responsibility, and actual involvement of Musal in the financial decision making process at Access Air. Musal further represented to the Court that he did not believe that Rosen "has any knowledge relative to the accuracy of the Internal Revenue Service Assessment." Musal argued at that time that the Government had not yet disclosed the specifics of Rosen's anticipated testimony. Judge Shields specifically stated in his Order that "this Court cannot find, *based upon the current record,* that the government has established the importance of these witnesses' testimony." (emphasis added).

At the time Judge Shields entered his order, the record was devoid of information explaining the substance of Rosen's anticipated testimony and why it was rele-

---

**13.** This case is essentially defended on the grounds that the financial records of Access Air were in such an unreliable state that the precise amount of excise taxes collected and held in trust for the United States could not be determined. This argument is offered by Mr. Musal, an accountant by profession, who initially was the chief financial officer, became the chief executive officer, and demonstrated in the documentary evidence a keen understanding of the obligations regarding the excise taxes. The law would be frustrated if poor records and accounting practices on the part of the taxpayer could defeat the tax obligation. "This court must accept the Commissioner's method of reconstructing income

so long as it is rationally based." *Caulfield,* 33 F.3d at 993, quoting *Rowell v. Comm'r,* 884 F.2d 1085, 1087 (8th Cir.1989). While the method used in making the assessment in this case seems a patently minimal effort, the assessment was made under difficult circumstances and was significantly supported by the ultimate record in the trial. As directed by Final Jury Instruction 15, the assessment needed to be reasonable, not flawless, and may be an estimate if it is substantially correct. Under the circumstances of this case as established in the trial record, a reasonable jury could find that Musal did not prove the assessment was erroneous and excessive.

vant. When this Court reconsidered and concurred with the findings of Judge Shields, the Government had informed the Court that Rosen was expected to testify that after Access Air filed bankruptcy, he was hired to conduct a review of Access Air's revenue accounting system and provide a report of his findings to Musal, which he did. The Government did not explain to the Court that it anticipated Musal would be making the validity of the software an issue or otherwise establish why this testimony from Rosen was relevant.

It was not until the first day of Musal's trial that newly assigned Government counsel explained that it wanted to call Rosen to testify about the accuracy and reliability of the software system that Access Air had been using for its revenue accounting, stating to the Court that Musal had indicated part of his defense would be that the software designed by Rosen and used by Access Air was inherently flawed. None of Musal's filings up to that point in these proceedings contained an argument regarding the accuracy of the software system.[14] Musal affirmed to the Court that he intended to raise this issue during the course of the trial. Upon obtaining this new information, the Court found Rosen's testimony was extremely relevant to this narrow issue, as Rosen was the designer of the software and therefore would be the best person to explain to the jury the software system and how it operated. The Court limited Rosen's testimony to simply the validity of the software system, what had to be changed in the system, and what Rosen was asked to do in the process of trying to clean up the accounting. The Court stated that Rosen would not be per-

mitted to testify regarding his opinion on what amount of excise tax was owing.

Had the Court been made aware by either party in February, at the time of the Motion to Reconsider, that Rosen's testimony was highly relevant to an issue Musal would be raising as a defense, the Court would have ruled differently. The record was not fully developed on the issue, and the Court was not fully informed of the relevancy of Rosen's anticipated testimony prior to ruling on the Motion to Reconsider. The Court surmises that Musal had some inclination regarding the information Rosen possessed, as it was Musal who listed Rosen on his initial disclosures, and Musal was fully aware that Rosen designed the software that was being used to track Access Air's revenue accounting. By calling Rosen as a witness, the Government inserted no new issues into the trial. Musal has failed to establish a substantial increase in the cost of litigation due to Rosen being allowed to testify, and there is no showing that Musal was unduly prejudiced by the Court's decision to allow Rosen to testify. The Court has broad discretion to reconsider its prior orders, and the Court concludes its decision to reconsider its prior order and allow Rosen to testify was reasonable and does not constitute an abuse of discretion.

## C. Exhibit 4502

Musal contends that Exhibit 4502 is hearsay and that no foundation was laid to establish any applicable exception to the hearsay rule, arguing that without Rosen's testimony, no such foundation could ever be established. As discussed above, the

---

**14.** Throughout these proceedings, Musal has asserted that Exhibit 4050, which was generated using Rosen's software, reflected the excise taxes actually collected by Access Air, as opposed to those due and owing to the IRS. Over time this argument morphed into one

attacking the accuracy and reliability of the actual numbers contained in Exhibit 4050. Prior to the trial, the argument was never framed to this Court as one attacking the reliability of the actual software system itself.

Court concludes Rosen's testimony was properly admitted.

 Having prepared Exhibit 4502 himself, Rosen provided the foundation and authenticated that exhibit. Rule 901(a) of the Federal Rules of Evidence provides that "authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R.Evid. 901(a). "To meet this standard, the proponent need only demonstrate a rational basis for its claim that the evidence is what the proponent asserts it to be." *United States v. Coohey,* 11 F.3d 97, 99 (8th Cir.1993).

At trial, Rosen testified that Exhibit 4502 consisted of two pages and was prepared by him in approximately January of 2000. Rosen testified that the first page of Exhibit 4502 represented records that had already been processed when he began the revenue cleanup and that the second page represented documents that were not yet put into the software system, for example, reports not yet audited or refunds not yet made to the purchaser. This second page was essentially a report of what needed to be done for the revenue cleanup. The Court concludes Exhibit 4502 was properly authenticated prior to being admitted into evidence. The information contained in the exhibit was either collected by Access Air and provided to Rosen as a starting point for his financial clean-up tasks or information he generated in the clean-up process or for purposes of planning the remainder of the clean-up process. The document contains information that explains Rosen's efforts, his understanding, and his review of the accounting systems, without regard to the truth of the statements contained in Exhibit 4502.

Musal further argues that Exhibit 4502 is, as a matter of law, on its face unreliable and untrustworthy. Musal asserts that Exhibit 4502 estimates that Access Air made ticket sales in excess of $1.2–million in the month of December 1999, but that the undisputed evidence is that Access Air filed for bankruptcy protection on November 29, 1999, and there were no flight operations other than limited charters in the month of December 1999. Musal maintains that Exhibit 4502 is patently flawed.

 Page two of Exhibit 4502 does reflect sales in excess of $1.2–million in the month of December 1999. Page two also reflects nearly $1–million in refunds, after the bankruptcy filing, for the month of December 1999. There appears to be no question that the revenue accounting methods utilized by Access Air were less than ideal for purposes of maintaining accurate financial records. The fact remains that this is how Access Air maintained its revenue accounting information, as unreliable as Mr. Musal may complain Exhibit 4502 appears to be; and this is how the company, of which he was CFO, chose to maintain its records. Musal was free to argue to the jury his assertion that Exhibit 4502 was unreliable and indeed did make that argument during closing statements. Rosen himself testified that the purpose of his review was not to see whether the accounting system had accurately reported the information contained in Exhibit 4502 but rather to establish what all of the discrete numbers were. Musal was free to argue the reliability and trustworthiness of Exhibit 4502 in whole or in part, but the Court cannot as a matter of law conclude that Exhibit 4502 is on its face so unreliable and untrustworthy.

 "Post-verdict judgment as a matter of law is appropriate only where the evidence is entirely insufficient to support the verdict." *Belk v. City of Eldon,* 228 F.3d 872, 878 (8th Cir.2000); *see also Top of Iowa Co-op. v. Schewe,* 324 F.3d 627,

633 (8th Cir.2003). The jury's task was not to judge the methods in which the IRS obtained its penalty tax assessment but instead to determine, based on all of the evidence presented at trial, whether the assessment amount was erroneous and excessive. "A jury verdict must be affirmed unless, viewing the evidence in the light most favorable to the prevailing party, we conclude that a reasonable jury could have not found for that party." *Webner,* 267 F.3d at 833 (quoting *Cross,* 142 F.3d at 1066). Viewing the evidence in the light most favorable to the Government, the Court concludes a reasonable jury could have found for the Government. The record does not support the conclusion that the evidence is entirely insufficient to support the jury's findings. Musal's Renewed Motion for Judgment as a Matter of Law must be denied.

## II. Motion for New Trial

■ Musal asserts that should the Court determine he has not established as a matter of law that the assessment is erroneous and excessive, and/or that he is not entitled to judgment as a matter of law as to the amount of tax, if any, due for the fourth quarter of 1999, the Court should grant him a new trial as to such issues.

■ Rule 59 provides that a new trial may be granted "in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed. R.Civ.P. 59(a)(1). Great deference is afforded a district court's ruling on a motion for new trial and will not be disturbed absent a "clear abuse of discretion." *Belk,* 228 F.3d at 878. " 'The key question is whether a new trial should [be] granted to avoid a miscarriage of justice.' " *Id.* (quoting *McKnight v. Johnson Controls,* 36 F.3d 1396, 1400 (8th Cir.1994)). " 'When the basis of the motion for a new trial is

that the jury's verdict is against the weight of the evidence, the district court's denial of the motion is virtually unassailable on appeal.' " *Wash Solutions,* 395 F.3d at 892 (internal quotations omitted) (quoting *Jones v. Swanson,* 341 F.3d 723, 732 (8th Cir.2003)).

Musal asserts that a new trial should be granted because the Court erroneously admitted into evidence Exhibits 4050 and 4502 and the testimony of Rosen. The Court must therefore determine whether these evidentiary rulings were so prejudicial as to require a new trial such that a new trial would produce a different outcome on the issues. *O'Dell v. Hercules, Inc.,* 904 F.2d 1194, 1200 (8th Cir.1990) ("A trial court must determine whether an evidentiary ruling was so prejudicial as to require a new trial which would be likely to produce a different result.").

■ A limiting instruction informing the jury that it could consider Exhibit 4050 only for the purpose of knowing what the IRS relied on in making its assessment, but not for the truth of the amounts set forth therein, would not have produced a different jury verdict in light of the numerous other documents admitted into evidence which support a finding that the IRS assessed amount was not erroneous or excessive. The Court concludes Exhibit 4050 is not hearsay, and the Court's failure to give the jury a limiting instruction pertaining to that exhibit is not so prejudicial as to require a new trial.

■ After the record was supplemented with additional information regarding the nature of Rosen's relevant knowledge and anticipated testimony, it was well within the Court's discretion to permit Rosen to testify, and Rosen provided the adequate foundation for Exhibit 4502. The Court concludes the three evidentiary rulings of which Musal complains are not so prejudicial as to require a new trial

which would likely produce a different result.

## CONCLUSION

Musal's Motion for Judgment as a Matter of Law and Motion For a New Trial (Clerk's No. 270) must be **denied.**

**IT IS SO ORDERED.**